The PEOPLE of the State of
Colorado, Petitioner,

v.

Antonio HARRIS, Respondent.

No. 86SC285.

Supreme Court of Colorado,
En Banc.

July 5, 1988.

Rehearing Denied Aug. 15, 1988.

Certiorari Denied Dec. 5, 1988.
See 109 S.Ct. 541.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Peter J. Stapp, Asst. Atty. Gen., Denver, for petitioner.

Gerash, Robinson, Miller & Miranda, P.C., Scott H. Robinson, Denver, for respondent.

ERICKSON, Justice.

Defendant Antonio Harris was convicted by a jury of first-degree sexual assault, section 18–3–402(3)(a), 8 C.R.S. (1978 & 1984 Supp.), and conspiracy to commit sexual assault, section 18–2–201, 8 C.R.S. (1978). The primary issue on appeal is whether statements made by the defendant, who had been advised of and had waived his *Miranda*[1] rights, and who was in custody pursuant to a Crim.P. 41.1 order for nontestimonial identification, should be suppressed as violative of his constitutional rights. The court of appeals reversed the conviction, finding that statements procured from Harris during execution of a Crim.P. 41.1 order were obtained in violation of the defendant's constitutional rights against illegal search and seizure under the fourth amendment of the United States Constitution and article II, section 7 of the Colorado Constitution. *People v. Harris,* 729 P.2d 1000, 1002 (Colo.App.1986). The court of appeals also concluded that the trial court improperly restricted cross-examination of a prosecution rebuttal wit-

ness. Finally, the court held that comments made by the prosecution during closing argument relating to the defendant's failure to call his wife as a witness went beyond permissible comment on a lack of evidence. We granted the prosecution's writ of certiorari and now affirm the court of appeals.

## I.

On June 4, 1984, two men sexually assaulted a woman on the Boulder campus of the University of Colorado. The victim gave a relatively detailed description of the two men, whom she said she had never seen before. On June 6, 1984, pursuant to Crim.P. 41.1, an order for nontestimonial identification evidence was issued for the defendant, Antonio Harris. The order[2] was executed by Detective DeLaria of the University of Colorado Police Department on June 7, 1984, who served the defendant at a Boulder construction site where he had been working. The order authorized the taking of blood samples, pubic and scalp hair samples, saliva samples, photographs, fingerprints, foot-size measurements, a voice exemplar, as well as requiring the defendant's participation in a lineup.

DeLaria advised the defendant of his *Miranda* rights while transporting him to the Boulder Community Hospital and explained to Harris that he could talk and exchange information with the police. DeLaria told the defendant that he would cease questioning him if he requested a lawyer. DeLaria then proceeded to ask Harris questions about his actions and whereabouts on the night of the assault. In response to these questions, the defendant provided details regarding where he had been, whom he had been with, and what he had been doing.

The defendant was questioned en route to the hospital, at the hospital, on the way to the lineup, and at the lineup itself. The questioning ceased only after the defend-

---

**1.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** According to the order, there were reasonable grounds to suspect that Antonio Harris committed the crime of first-degree sexual assault and the results of the nontestimonial identification procedures would be of assistance in determining whether Harris committed the crime.

ant's attorney arrived and asked the officer to stop asking questions. DeLaria testified that his interrogation of the defendant was "part of the plan" in that he intended to get information from him.

After arraignment, the defendant moved to suppress his statements to Detective DeLaria, arguing that the interrogation extended beyond the scope of the Crim.P. 41.1 order. The trial court denied the motion. In arriving at this conclusion, the court made the following findings: the defendant's detention did not exceed the scope of the Crim.P. 41.1 order; the order was not a ruse; the sole motivation for obtaining the order was to procure those items authorized by the order; the defendant's statements were obtained in compliance with *Miranda;* the defendant waived his *Miranda* rights; and the statements made by the defendant to the officer were voluntary.

The court of appeals reversed the trial court and concluded that the defendant's constitutional rights against illegal search and seizure had been violated because the preplanned interrogation of the defendant exceeded the limited purpose and limited intrusiveness contemplated by Crim. P. 41.-1. *Harris,* 729 P.2d at 1002. The court also found that *Miranda* warnings by themselves do not dissipate the taint of a fourth amendment violation even though the statements were otherwise voluntary. *Id.*

## II.

■ In determining whether the defendant's statements made in response to police interrogation, while he was in custody pursuant to a Crim.P. 41.1 order, should be suppressed as violative of the fourth amendment and its Colorado counterpart, we initially must decide whether a police officer, in executing a nontestimonial identification order, is authorized to interrogate a suspect who is in custody on less than probable cause.

## A.

In *Davis v. Mississippi,* 394 U.S. 721, 727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969), the Supreme Court suggested that under narrowly circumscribed procedures, limited intrusions based on less than probable cause might be constitutionally permissible. Crim.P. 41.1 was adopted by this court in response to *Davis.*[3] While the United States Supreme Court has never expressly addressed the constitutionality of such procedures, it has reaffirmed that the fourth amendment may permit procedures similar to those in Crim.P. 41.1. *Hayes v. Florida,* 470 U.S. 811, 817, 105 S.Ct. 1643, 1647, 84 L.Ed.2d 705 (1985); *Dunaway v. New York,* 442 U.S. 200, 215, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). In *People v. Madson,* 638 P.2d 18 (Colo.1981), this court upheld the constitutionality of Crim.P. 41.1.

### 1.

The prosecution asserts that the nature of a Crim.P. 41.1 order is not made more intrusive by asking the defendant questions. This claim "lies at the crossroads of the Fourth and Fifth Amendments," *Brown v. Illinois,* 422 U.S. 590, 591, 95 S.Ct. 2254, 2255, 45 L.Ed.2d 416 (1975), and requires us to examine the nature and origin of Crim.P. 41.1 in the context of the general rule that searches and seizures must be based on probable cause. The fourth amendment provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . ." These rights are applicable to the states through the fourteenth amendment. *Mapp v. Ohio,* 367 U.S. 643, 81

---

**3.** In October 1969, this court adopted rule 41.1 of the Colorado Rules of Criminal Procedure, entitled "Court Order for Fingerprinting." The current version of Crim.P. 41.1 was adopted in 1974.

At least five other states have adopted rules relating to nontestimonial identification. *See* Ariz.Rev.Stat.Ann. § 13–3905 (1978); Idaho Code § 19–625 (1987); Iowa Code chapter 810 (1987); Neb.Rev.Stat. § 29–3301 to –3307 (1985); N.C.Gen.Stat. §§ 15A–271 to –282 (1987).

S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[4] The execution of an order for nontestimonial interrogation constitutes a seizure under the fourth amendment and article II, section 7 of the Colorado Constitution. *Madson*, 638 P.2d at 31.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court first recognized an exception to the requirement that fourth amendment seizures must be based on probable cause. Since the "stop and frisk" at issue in *Terry* was considered less severe than that involved in a traditional arrest, the Court did not extend the traditional concept of arrest—and the general rule requiring probable cause to make arrests "reasonable" under the fourth amendment —to cover such intrusions. Rather, in an effort to balance the limited violation of individual privacy against the state's interest in crime detection and prevention, and in the safety of the police, 392 U.S. at 22–27, 88 S.Ct. at 1880–83, the Court established "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27, 88 S.Ct. at 1883.

"Because *Terry* involved an exception to the general rule requiring probable cause, [the] Court has been careful to maintain its narrow scope." *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979); *see, e.g., United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (brief detention permitted where reason to believe suspect was involved in a felony); *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (detention permitted to ensure that flight will not occur if incriminating evidence is found, to minimize risk to police, and to facilitate the orderly completion of the search); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (order to get out of car is permissible *de minimis* intrusion after car is lawfully detained for traffic violations; frisk for weapons justified after "bulge" observed in jacket); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (frisk for weapons on basis of reasonable suspicion). Consequently, for all but those circumstances enumerated by the Court, "seizures are 'reasonable' only if supported by probable cause." *Dunaway*, 442 U.S. at 214, 99 S.Ct. at 2257.

In *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the defendant, a rape suspect, was brought into the police station for questioning and fingerprinting. At issue was whether the detention of the defendant on less than probable cause for purposes of fingerprinting constituted an unreasonable seizure of his person in violation of the fourth amendment. The Supreme Court noted that the fourth amendment was designed "to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" 394 U.S. at 726–27, 89 S.Ct. at 1397 (footnote omitted). The Court also discussed the distinctions between fingerprinting and interrogation.

*Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an inter-*

4. Article II, section 7 of the Colorado Constitution provides:

**Security of person and property—searches —seizures—warrants.** The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing.

Defendant correctly asserts that we need not address the issue under the fourth amendment if we find that the police have violated the Colorado Constitution. While it is true that the Colorado provision protects a greater range of privacy interests than does the fourth amendment, *People v. Oates*, 698 P.2d 811 (Colo.1985), because Crim.P. 41.1 was adopted in response to *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and our resolution of the issues here require the examination and application of Supreme Court precedent, we decline to resolve the problem solely on state grounds.

*rogation or search.* Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the "third degree." Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time.

*Id.* at 727, 89 S.Ct. at 1398 (emphasis added).

In concluding that the fourth amendment applied to a defendant being detained for the sole purpose of obtaining his fingerprints, the Court stated that "under narrowly defined circumstances," detention for the purpose of obtaining fingerprints may, despite a lack of probable cause, comply with the fourth amendment. *Id.* One of the reasons the Court declined to address this issue was because the "petitioner was not merely fingerprinted during the . . . detention but *also subjected to interrogation.*" *Id.* at 728, 89 S.Ct. at 1398 (emphasis added) (quoted with emphasis in *Dunaway,* 442 U.S. at 215, 99 S.Ct. at 2258). Accordingly, the court concluded that the detention violated the fourth amendment. *See also, Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the defendant, arrested without probable cause and without a warrant, was given *Miranda* warnings, taken into custody, and transported to the police station where he made two inculpatory statements. The Court noted that the illegal arrest "had a quality of purposefulness" and stated:

The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was "for investigation" or for "questioning". . . . The arrest, both in design

and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up.

*Id.* at 605, 95 S.Ct. at 2262 (citation and footnote omitted).

In *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court, relying upon its previous decisions in *Davis* and *Brown,* held that when police seize a criminal suspect without probable cause and transport him to the police station for interrogation, they violate the suspect's rights under the fourth and fourteenth amendments. *Dunaway,* 442 U.S. at 216, 99 S.Ct. at 2258. While we acknowledge that the defendant in this case was lawfully in custody, it is nevertheless against this standard that we must determine whether interrogation of the defendant during the execution of the Crim.P. 41.1 order violated his constitutional rights.

### 2.

An order authorizing nontestimonial identification is only warranted if there is probable cause to believe that an offense has been committed; that there are reasonable grounds, not amounting to probable cause to arrest, to suspect that the person named or described in the affidavit committed the offense; and that the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense. Crim.P. 41.1(c). In addition to these requirements, we have declared that such intrusions on less than probable cause should meet the following conditions:

First, there must be an articulable and specific basis in fact for suspecting criminal activity at the outset. Second, the intrusion must be limited in scope, purpose and duration. Third, the intrusion must be justified by substantial law enforcement interests. Last, there must be an opportunity at some point to subject the intrusion to the neutral and detached scrutiny of a judicial officer before the evidence obtained therefrom may be ad-

mitted in a criminal proceeding against the accused.

*People v. Madson*, 638 P.2d 18, 31–32 (Colo.1981).

■ The rule also requires that a nontestimonial identification order specify the "nontestimonial procedures to be conducted." Crim.P. 41.1(e)(3).[5] If, for instance, a nontestimonial identification order only authorizes the taking of a suspect's fingerprints, but a police officer also subjects the suspect to a seizure of saliva and hair samples, the officer's action would exceed the scope of the order by failing to comply with Crim.P. 41.1(e)(3). The saliva and hair samples would presumably be inadmissible for failing to comply with Crim.P. 41.-1(e)(3). Accordingly, Crim.P. 41.1 limits the scope and purpose of nontestimonial identification procedures to those matters specifically listed within the order. This view is consistent with our statement in *Madson* that limited intrusions into privacy on less than probable cause may be squared with the fourth amendment when, *inter alia*, the intrusion is "limited in scope, purpose and duration." 638 P.2d at 31.

Crim.P. 41.1(h)(2) states:

"Nontestimonial identification" includes, but is not limited to, identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, specimens of material under fingernails, or other reasonable physical or medical examination, handwriting exemplars, voice samples, photographs, appearing in lineups, and trying on articles of clothing.

This provision is not an exclusive list of nontestimonial identification procedures. Nevertheless, the absence of interrogation in this subsection, in our view, is no mistake since interrogation, by definition, is not a "nontestimonial identification" procedure. We acknowledged this principle in *Madson*, where we stated: "The rule is limited to nontestimonial identification evidence only and does not authorize the acquisition of testimonial communications protected by the privilege against self-incrimination." 638 P.2d at 32 (citation omitted).[6] This statement finds support in *Davis v. Mississippi*, 394 U.S. 721, 728, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676 (1969), where the Court found the fruits of a nontestimonial identification procedure to be inadmissible, in part, because the detention of the defendant also included interrogation.

A survey of jurisdictions with similar statutes reflects that no such statute authorizes interrogation. The North Carolina Statute flatly prohibits police interrogation, in requiring the order to state: "That the person will not be subjected to any interrogation or asked to make any statement during the period of his appearance except that required for voice identification." N.C.Gen.Stat. § 15A–278(6). A predecessor statute to Arizona Revised Statute Annotated § 13–3905, which was passed shortly after Crim. P. 41.1, does not address whether interrogation is permitted. However, in addressing the interrogation issue, one commentator noted:

Clearly, if the procedure allowed by section 13–1424 is to be held constitutional, it must be narrowly defined and controlled. Only those procedures authorized by the court order should be tolerated. To allow the statute to be used for purposes of interrogation on less than probable cause would be an intrusion into the area of communicative evidence that would assuredly be unconstitutional.

Comment, *Detention For Taking Physical Evidence Without Probable Cause*, 14 Ariz.L.Rev. 132, 154 (1972).

5. Crim.P. 41.1(e) provides:

**Contents of Order.** An order to take into custody for nontestimonial identification shall contain:

(1) The name or description of the individual who is to give the nontestimonial identification;

(2) The names of any persons making affidavits for issuance of the order;

(3) The criminal offense concerning which the order has been issued and the nontestimonial identification procedures to be conducted specified therein;

(4) A mandate to the officer to whom the order is directed to detain the person for only such time as is necessary to obtain the nontestimonial identification;

(5) The typewritten or printed names of the judge issuing the order and his signature.

6. The A.L.I. Model Penal Code of Pre–Arraignment Procedure, § 170.7(4) (1975), provides:

No person while detained pursuant to a nontestimonial order shall be subject to "questioning" as that term is defined in Subsection 140.8(5) of this code.

### 3.

*Davis* and its progeny did not state, and we do not suggest, that all statements and confessions of a suspect, who is detained for purposes of obtaining nontestimonial evidence pursuant to narrowly circumscribed procedures, are inadmissible. A statement of a suspect who is detained pursuant to a Crim.P. 41.1 order, may, under some circumstances, be admissible—for example, where a suspect initiates a conversation with the police and, despite a lack of coercion or interrogation, voluntarily offers them information. If the exclusive object of executing a Crim.P. 41.1 order is to obtain nontestimonial evidence and the suspect makes inculpatory remarks, which are not the result of governmental coercion, such statements may not violate his constitutional rights. In our view, an examination of the circumstances surrounding the statement of a suspect is required to determine whether the police exceeded the scope of the 41.1 order. Factors relevant to this determination include: the subjective intent of the police in executing the order; an objective assessment of the officer's actions in light of the facts and circumstances known to him; the identity of the party who initiated the conversation that led to a suspect's inculpatory statement or confession; and the physical environment of the suspect when such statements were made.

In examining DeLaria's subjective intent in executing the Crim.P. 41.1 order, the court of appeals reversed the trial court's ruling and characterized the interrogation as "preplanned." *People v. Harris,* 729 P.2d 1000, 1002 (Colo.App.1986). Although the Crim.P. 41.1 order was procured for a legitimate purpose, the court of appeals correctly held that the police officer's execution of the Crim.P. 41.1 order was a ruse intended to put the defendant in a position where he might talk. The defendant was taken into custody at his job site. He was immediately transported to a hospital for removal of pubic hairs, head hairs, and blood and saliva samples. After reading the defendant his *Miranda* rights, Harris told him "that he could talk to us, we could exchange information[;] I could tell him what is going on." DeLaria also told Harris that the police were investigating a sexual assault and that he was seen in the area.

The record reflects that DeLaria intended to elicit information from the defendant. DeLaria testified that in executing the 41.1 order, questioning the defendant had been "part of the plan." Knowing that the defendant was the focus of the investigation, DeLaria wanted to get information from him. The initial questioning was designed to develop rapport so that the officers could obtain details to "check out later." DeLaria had even attempted to tape record the defendant's responses, but failed to activate the recorder. At the suppression hearing, defense counsel's cross-examination of DeLaria resulted in the following exchange:

Q. Did you tape record your conversation with Mr. Harris?

A. I tried but the tape recorder failed.

Q. Did you get anything on tape?

A. No, I didn't turn on the button.

Q. You must have asked him if he raped the woman he was being investigated of raping?

A. No, I didn't.

Q. Why not?

A. Well, I was laying the ground work for it.

Q. Laying the ground work? What do you mean?

A. Developing a rapport, listening to what he had to say, listening to his story.

Q. Okay, you were trying to see whether he could give you a bunch of details and maybe you could check those details out or explore them, right?

A. That is correct.

Q. Investigative technique, isn't it?

A. Yes.

Q. Kind of reel them in slowly, right?

A. Whatever, sure.

Q. Okay, you are using your ability as a detective.

A. Right.

Q. Fine form on this occasion?

A. Right.

Q. You must have questioned him more than is in the report given that you folks went all the way to the hospital, were at the hospital [and] then went to the C.U. Police Department?

A. No, this is over a period of time like in the car and then while we were waiting for the examination and then back at the Police Department and we were going over some of the details.

We will not overturn the trial court's findings of fact when they are supported by adequate evidence in the record. *People v. Corley*, 698 P.2d 1336, 1339 (Colo. 1985). Factual findings, however, "must be set aside when they are 'so clearly erroneous as not to find support in the record.'" *People v. Johnson*, 653 P.2d 737, 740 (Colo.1982) (quoting *Page v. Clark*, 197 Colo. 306, 315, 592 P.2d 792, 796 (1979)). The record establishes that DeLaria intended to interrogate the defendant when he executed the Crim.P. 41.1 order. Accordingly, we set aside the trial court's contrary findings.

In this case, DeLaria initiated the conversations that resulted in the defendant's inculpatory statements. He did not ask the defendant questions to obtain an exemplar or to further any other purpose relating to the execution of the 41.1 order. The questioning of the defendant was in no way associated with a concern on DeLaria's part for the safety of himself or the general public. Indeed, the defendant was not handcuffed and, according to DeLaria, was cooperative. From the time the defendant was served the order at his work site he was in DeLaria's custody and was not free to leave.

DeLaria was, in effect, using a nontestimonial identification order to conduct a custodial interrogation on less than probable cause. Crim.P. 41.1 simply does not authorize a police officer to intentionally and purposefully elicit information from a criminal suspect, who, on less than probable cause, was unexpectedly picked up from his job site, served with an order requiring him to submit to various intrusions of his body, taken to a hospital for seizures of various bodily fluids and hair samples, and then taken to the police station for additional seizures—all with the knowledge that he was not free to leave. Under the facts of this case, conducting a full-blown custodial interrogation, on less than probable cause, under the guise of the narrowly prescribed procedures of Crim.P. 41.1, violated the defendant's rights under the fourth amendment and article II, section 7 of the Colorado Constitution.

### B.

■ The prosecution asserts that after the defendant knowingly and voluntarily waived his *Miranda* rights, questioning him did "not turn the valid Crim.P. 41.1 order into an illegal arrest." Having concluded that the Crim.P. 41.1 order did not authorize DeLaria to interrogate the defendant, we must determine whether *Miranda* warnings sufficiently attenuated the taint of the illegally expanded detention to render defendant's statement admissible.

It is undisputed that proper *Miranda* warnings were given to the defendant and that his statements were "voluntary" for purposes of the fifth amendment. In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Court stated that the fourth and fifth amendments frequently appear to coalesce since "the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment." *Id.* at 601, 95 S.Ct. at 2260 (quoting *Boyd v. United States*, 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886)). The interests and policies served by the exclusionary rule under the fourth amendment differ from those served under the fifth amendment. *Brown*, 422 U.S. at 601, 95 S.Ct. at 2260. "[E]xclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to

protect the Fourth. *Miranda* warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation." *Id.* (footnote omitted). Voluntariness for purposes of the fifth amendment is therefore only a threshold requirement for fourth amendment analysis. *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979).

In *Brown*, the Court stated that the issue of whether a confession is a product of a free will depends on the facts of each case. 422 U.S. at 602, 95 S.Ct. at 2261 (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). In determining whether a confession is obtained by exploiting an illegal arrest, the Court noted that *Miranda* warnings are an important factor but not the only factor to be considered. In this case, the defendant was given proper *Miranda* warnings. Detective DeLaria elaborated on those warnings and told the defendant he would stop questioning him if he did not want to answer additional questions or if he wanted an attorney. We are not, however, convinced that the *Miranda* warnings purged the taint created by illegally expanding the defendant's detention.

The Court in *Brown* set forth the following additional factors in determining whether a confession is obtained by exploitation of an illegal arrest: "The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant." *Id.* at 603–04, 95 S.Ct. at 2261–62 (citations and footnotes omitted); *see Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259. In *Brown*, the Court concluded that the confession was inadmissible because there was "no intervening event of significance" between the arrest and the confession, and that the arrest without probable cause had a "quality of purposefulness" because it was an expedition for evidence admittedly undertaken "in the hope that something might turn up." *Id.* at 604–05, 95 S.Ct. at 2262; *see McCall v. People*, 623 P.2d 397, 403 (Colo.1981).

In this case, the detention, for the purpose of obtaining nontestimonial evidence, was illegally expanded to elicit testimonial evidence relating to the crime under investigation when DeLaria questioned the defendant on the way to the hospital. The defendant began making inculpatory responses almost immediately thereafter. This left no time for any intervening circumstances between the arrest and the defendant's statements. Finally, the interrogation on less than probable cause was, by DeLaria's own admission, intended to elicit information from the defendant.

The statements of the defendant resulted from the illegal expansion of the Crim.P. 41.1 order. Because no intervening event broke the causal connection between the police illegality and the defendant's statements, that illegality was not dissipated. *McCall*, 623 P.2d at 404. "To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth.' " *Dunaway*, 442 U.S. at 219, 99 S.Ct. at 2260 (footnote omitted). We therefore conclude that the interrogation of the defendant violated his fourth amendment rights.

### III.

■ The prosecution contends that the court of appeals erred in concluding that defendant's cross-examination of a rebuttal witness was improperly limited. A gray jacket seized from Lonzo Harris, defendant's brother, during the investigation of an unrelated aborted kidnapping, was introduced at trial by the prosecution. The jacket was used at trial to help establish the identity of the two assailants in this case. The victim testified that the second assailant had worn a blue jacket. Lonzo Harris and Ricardo Fortenberry, the defendant's cousin, were implicated in the aborted kidnapping, which occurred the night after the rape in this case. The two men fit the descriptions of the kidnappers, and the next day, Fortenberry confessed

his involvement in the abduction to a friend. Fortenberry also told his friend that he intended to leave the jurisdiction. Fortenberry and Lonzo Harris were later arrested in Oakland, California.

The record indicates that Ricardo Fortenberry strongly resembles the defendant and that he had been mistaken for the defendant just two days before the victim's assault. Fortenberry fit the description of the second assailant, corresponding closely in both height and weight, and in having a mustache, wearing his hair "wet or shiny" from gel, and being strongly cologned just a few hours before the assault. In addition to the physical characteristics, chemical testing revealed that Fortenberry fell into the two percent of the population who could be the source of the semen that was recovered from the victim. A gray jacket similar to the one worn by the second assailant in this assault was said to have been worn on occasion by Fortenberry. Ownership of the jacket recovered from Lonzo Harris was therefore important in determining the identify of the assailant.

Lee Hamilton, a friend of Antonio Harris, testified that he had seen Ricardo Fortenberry wear the jacket more than once, but had never seen the defendant wear it. On cross-examination, defense counsel asked: "Do you recall telling Ms. Cracraft on October 10 that even though Lonzo was shorter than Ricky that they both wore the same size jackets?" The prosecution objected to this question, as going beyond the scope of direct examination. The objection was sustained. Defense counsel then asked: "And did you not tell Ms. Cracraft on October 23, 1987, that Lonzo and Ricky sometimes traded clothes?" The prosecution's objection was sustained on the same grounds. Defense counsel did not make an offer of proof that the statements had actually been made.

The court of appeals noted that the defendant had failed to show that the limitation was manifestly prejudicial, but stated

that upon retrial, care should be taken not to unnecessarily limit cross-examination on matters affecting the credibility of a witness. We agree.

In *People v. Loscutoff*, 661 P.2d 274 (Colo.1983), we noted that the constitutional right to confront and cross-examine witnesses is tempered by the trial court's authority to prohibit cross-examination on matters wholly irrelevant and immaterial to issues at trial. The trial court, of course, has discretion to determine the scope and the limit of cross-examination, *People v. Homan*, 185 Colo. 56, 521 P.2d 1262 (1974), and absent an abuse of discretion, its rulings will not be disturbed on review, *People v. Raffaelli*, 647 P.2d 230 (Colo.1982). Here, the critical issue was identification of the defendant and his alleged accomplice. Defense counsel was attempting to impeach the witness so as to advance his theory of misidentification. The questions on cross-examination related to whether Lonzo Harris and Ricky Fortenberry wore the same size jackets and whether the two traded clothes. In our view, it is not clear that the cross-examination exceeded the scope of the direct examination.[7] Moreover, because defense counsel was attempting to impeach the credibility of the witness, cross-examination on matters related to the jacket should have been permitted. CRE 611(b); *cf. People v. Frezquez*, 186 Colo. 146, 526 P.2d 146 (Colo.1974).

The prosecution asserts that defense counsel erred in failing to make an offer of proof. CRE 103 provides, in pertinent part:

(a) **Effect of erroneous ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

(2) **Offer of Proof.** In case the ruling is one excluding evidence, the substance of the evidence as made known to the

---

7. CRE 611(b) provides:
    **Scope of Cross-examination.**
    Cross-examination should be *limited to the subject matter of the direct examination and matters affecting the credibility of the witness.*

    The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.
    (Emphasis added.)

court by offer or was apparent from the context within which questions were asked.

In our view, the substance of the evidence was apparent from the context of the questions and an offer of proof was not necessary. Accordingly, we reverse the trial court.

## IV.

■ The defendant next contends that the trial court acted improperly in permitting the prosecutor, during closing argument, to comment on the defendant's invocation of the principle of spousal privilege. During trial, testimony established that the defendant told DeLaria that he was jogging on campus to sober up before he went home because his wife did not like him drinking. The defendant's wife did not testify, nor did the defendant. During closing argument, the prosecutor repeatedly commented on the fact that the defendant's wife did not testify. At one point during closing argument, the prosecutor stated:

> The rest of Antonio Harris' story is fabrication. How do you know that? Think about it.... And he did it because his wife gets mad when he drinks. That seems easy enough to take care of. The wife could tell you, 'I get mad when he drinks, and that night he had been drinking and so he went out running and when he left the house he had on jogging pants.' No wife ever testified.

Section 13–90–107(1)(a), 6 C.R.S. (1984 Supp.), in part, provides:

> A husband shall not be examined for or against his wife without her consent, nor a wife for or against her husband without his consent; nor during the marriage or afterward shall either be examined without the consent of the other as to any communications made by one to the other during the marriage....

8. The prosecution urges us to follow *People v. Medina*, 190 Colo. 225, 545 P.2d 702 (1976), which also involved the prosecution's comment on a wife's failure to testify. In that case, however, the defendant did not invoke his statutory right under section 13–90–107(1)(a).

This provision "precludes testimony by one spouse for or against the other without the consent of the other spouse." *People v. Lucero*, 747 P.2d 660, 667 (Colo.1987). In this case, the defendant had an absolute right not to call his wife, and not to permit her to testify. Permitting commentary on the defendant's invocation of that right is no less damaging to the privilege than allowing remarks alluding to an accused's invocation of the fifth amendment.[8] *See, e.g., State v. Charlton*, 90 Wash.2d 657, 585 P.2d 142 (1978).[9]

Accordingly, we affirm the court of appeals.

ROVIRA, Justice, dissenting:

I respectfully dissent from Part II.B. of the majority opinion, which holds that the statements Harris voluntarily made while he was in lawful custody for execution of a Crim.P. 41.1 order should have been suppressed.

In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that statements obtained in violation of the fourth amendment, even if made voluntarily for purposes of the fifth amendment, are admissible only if the making of the statements was "sufficiently an act of free will to purge the primary taint" of the illegal seizure. 422 U.S. at 602, 95 S.Ct. at 2261 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). The Court explained that:

> *Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.

422 U.S. at 603, 95 S.Ct. at 2261 (emphasis in original).

9. Defendant, for the first time, raises other alleged misconduct relating to the prosecution's closing argument. Because we did not grant certiorari on these issues, we will not address them.

The Court declined, however, to adopt a *per se* rule that statements made following an illegal arrest must be excluded. Instead, the Court announced the following test:

> The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive.... The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

422 U.S. at 603–04, 95 S.Ct. at 2261–62.

The giving of *Miranda* warnings, under the circumstances of this case, suggests rather strongly that Harris's decision to talk with DeLaria was the product of his free will.

Detective DeLaria testified at the suppression hearing that after serving Harris with the Crim.P. 41.1 order, he transported Harris to the hospital where several tests were to be performed. On the way to the hospital, he read the proper *Miranda* warnings to Harris and emphasized that even if Harris chose to waive his rights to remain silent and to have an attorney present during questioning, he could decline to answer any question DeLaria propounded. In addition, DeLaria explained that once the questioning began, Harris could terminate the interview completely if he desired and that he could request an attorney before continuing to answer questions. After being so informed, Harris agreed to talk with DeLaria, at which point DeLaria informed Harris that he was investigating a sexual assault that took place on the University of Colorado campus and that Harris had been identified as having been near the scene of the crime at about the time the crime was committed. Harris then explained that he had been drinking that evening and was "out running it off" because his wife did not like him to drink.

It is clear from the record before us that Harris understood his rights to remain silent and to have an attorney present during questioning, and that with full knowledge of these rights he voluntarily chose not to exercise them but instead to cooperate with DeLaria. We therefore need not be concerned that the responses Harris gave might have been unreliable as the product of duress, or that Harris was unaware of the nature of the investigation DeLaria was conducting. Harris's statements were not spontaneous—in which case it is clear they would have been admissible—but neither do they reflect an improvident or ill-considered decision to cooperate solely because Harris was in the lawful custody of a police officer.

*Brown* also requires that the court consider whether any intervening events or the passage of time between the defendant's arrest and his making of the statements might have severed the causal connection between the arrest and the subsequent making of the statements. I agree with the majority's view that no notable events interrupted DeLaria's questioning of Harris and that Harris made the statements shortly after the questioning began.

Finally, we must consider "particularly, the purpose and flagrancy of the official misconduct." The Court's emphasis of that factor is especially important where, as here, we are not concerned with determining whether a constitutional violation has occurred, but only with whether we should suppress statements a defendant concededly has made voluntarily after a knowing and intelligent waiver of his right to remain silent.

In those cases suppressing statements for violations of the fourth amendment, both the United States Supreme Court and this court have found clearly illegal police misconduct warranting the sanction of the exclusionary rule. In *Brown v. Illinois* itself, the defendant arrived at the back door of his apartment to see a stranger pointing a gun at him from inside the apartment, which the stranger—a Chicago policeman—had entered and searched illegally. Another officer, also brandishing

his weapon, approached Brown from behind and informed Brown that he was under arrest. In condemning the illegal search and seizure, and in suppressing statements Brown subsequently made while in the illegal custody of the police, the Court concluded that "[t]he manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." 422 U.S. at 605, 95 S.Ct. at 2262.

In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and in *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), police acting on the uncorroborated tips of informants took defendants into custody without probable cause for the purpose of interrogating them. The Court held that statements each made should have been suppressed, and in discussing the police misconduct the Court emphasized that the police action "had a 'quality of purposefulness' in that it was an 'expedition for evidence' admittedly undertaken 'in the hope that something might turn up.'" *Dunaway*, 442 U.S. at 218, 99 S.Ct. at 2259 (quoting *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262). *See also Taylor*, 457 U.S. at 693, 102 S.Ct. at 2668.

Finally, in *People v. McCall*, 623 P.2d 397 (Colo.1981), police officers investigating a possible murder discussed "how the three suspects might be made to incriminate themselves before they were taken into custody." 623 P.2d at 399. The officers then appeared at McCall's house where—after the officers overcame McCall's parents' objections to the questioning of their son by telling the parents that McCall was not a suspect and was not under arrest—the officers separated McCall from his parents and interrogated him. We held that the statements McCall made and evidence derived from those statements should have been suppressed, and we explained:

> [T]he evidence depicts a deliberate choice on the part of law enforcement officials

to exercise deception in gaining entry into the defendant's home and to employ trickery in their efforts to extract an incriminating statement from him. This type of official misconduct belies any legitimate claim to exemption from the sanctions of the exclusionary rule.

623 P.2d at 404.

That DeLaria should not have questioned Harris is mandated by decisions of the United States Supreme Court that are controlling. The question now, however, is the extent to which DeLaria's actions demand the sanction of suppression so as to deter future violations of this sort. *See United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974) ("[t]he [exclusionary] rule is calculated to prevent, not to repair") (quoting *Elkins v. United States*, 364 U.S 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)).

The majority opinion concludes that the district court erred in finding no misconduct on the part of DeLaria in questioning Harris during the execution of the Crim.P. 41.1 order.[1] In support of that finding, the majority suggests that the Crim.P. 41.1 order was utilized as part of some improper plot to detain Harris and to exploit that custody to get Harris to make incriminating statements. Close attention to the record, however, reveals nothing more sinister than a diligent detective utilizing an opportunity to question a potential witness or suspect who apparently was willing to provide what information he could.

The majority finds that:

> Although the Crim. P. 41.1 order was *procured* for a legitimate purpose, the court of appeals correctly held that the police officer's *execution* of the Crim.P. 41.1 order was a ruse intended to put the defendant in a position where he might talk.

At 657 (emphasis added).

With respect to the procurement of the order, the record demonstrates that DeLa-

---

1. The trial court found, in pertinent part:

   If the evidence had suggested that the 41.1 order was a ruse that the police officers engaged in ... to get Mr. Harris in a position where he might talk then the result might be

   different but the evidence in this case is absolutely clear and undisputed that the officers' motivation in getting this 41.1 order was purely and simply to get what the 41.1 order provided they could get....

ria participated only tangentially—if at all—in discussions leading to the decision to obtain the order. Neither Gary Arai, the detective who applied to the court for the order and who provided the affidavit in support thereof, nor the district attorney who reviewed the affidavit prior to its submission, suggested that DeLaria question the defendant while executing the order. In addition, it cannot be inferred from the record that either of the two intended or expected DeLaria to question Harris. In short, the trial court's finding that the procurement of the order was not part of any ruse to get Harris to talk is the only conclusion supported by the record.

The majority then focuses its attention on DeLaria's subjective mental state in executing the order and concludes, apparently, that because DeLaria intended to question Harris when he executed the order, he must have executed the order as a "ruse" to question Harris under coercive circumstances. As noted above, the purported ruse could not have included the perfectly proper procurement of the order in the first place. Thus it must have been DeLaria's intent to question Harris alone that constituted the improper "plan" he was carrying out.

I cannot agree with the majority's interpretation of the evidence for two reasons. First, apart from the simple fact that DeLaria intended to question Harris while executing the order, there is no evidence that DeLaria would not have questioned him but for the order or that DeLaria delayed his investigation until he could take advantage of the order to extract incriminating statements from Harris. In fact, DeLaria testified that he did not personally consider Harris a suspect in the case but, rather, that he thought Harris "could have been a witness too." And, as the majority notes, DeLaria did not pursue the questioning to the point of asking whether Harris committed the crime: DeLaria was conducting a routine background interview to help further his investigation of the crime in question. The majority's construal of DeLaria's testimony as suggesting anything more than that—and especially in finding among these facts evidence of some nefarious ruse—reads too much into DeLaria's words.

Second, to find that DeLaria's intent to question Harris during the execution of the order is itself substantial police misconduct renders the fourth consideration under *Brown*—the flagrancy of police misconduct—a virtual nullity. It is difficult to imagine circumstances under which an officer's interrogation of a suspect in custody pursuant to a Crim.P. 41.1 order would be less culpable than DeLaria's conduct here.

We are not today presented with a case in which the police acted in a manner "calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Nor are we confronted here, as we were in *McCall*, with the authorities' deliberate, preplanned deception and trickery in obtaining statements from a suspect. By interpreting DeLaria's intent to question Harris as the sort of misconduct that justifies suppression of Harris's statements, the majority applies a rule intended to deter police misconduct in a case in which that misconduct did not "rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of [defendant's] statements." *Rawlings v. Kentucky*, 448 U.S. 98, 110, 100 S.Ct. 2556, 2564, 65 L.Ed. 2d 633 (1980).

Accordingly, I would reverse the judgment of the court of appeals on the issue of whether Harris's statements should have been suppressed.[2]

---

**2.** The majority opinion, having concluded that the interrogation of the defendant violated his fourth amendment rights, goes on to consider whether the defendant's cross-examination of a rebuttal witness was improperly limited and whether the prosecutor's comments during closing argument were improper. In light of the majority's resolution of the fourth amendment issue, I do not think it necessary for the majority to consider the latter two issues since there is

---

little likelihood that those alleged errors will be
repeated in a new trial. Accordingly, I express
no opinion on either of those issues.