2013 CO 21

**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Jesus LUNA–SOLIS, Defendant–appellee**

**Supreme Court Case No. 12SA75**

Supreme Court of Colorado.

April 8, 2013

*C.A.R. 21*, Arapahoe County District Court Case No. 09CR1836 Honorable John L. Wheeler, Judge

Attorneys for Plaintiff–Appellant: Carol Chambers, District Attorney, Eighteenth Judicial District, Susan J. Trout, Senior Deputy District Attorney, Centennial, CO.

Attorneys for Defendant–Appellee: Douglas K. Wilson, Colorado State Public Defender, Natalie Girard, Deputy State Public Defender, Centennial, CO.

En Banc

JUSTICE COATS delivered the Opinion of the Court.

¶ 1 The People filed an interlocutory appeal pursuant to section 16–12–102(2), C.R.S. (2012), and C.A.R. 4.1, as well as a petition pursuant to C.A.R. 21, seeking relief from an order of the district court both suppressing statements of the defendant and excluding DNA evidence. Although the district court found that the statements in question were voluntary and were made after an effective waiver of *Miranda* rights, it nevertheless suppressed them on grounds that the Sixth Amendment barred the Denver police from questioning the defendant about an ongoing prosecution unless his counsel in that case were present. The district court similarly excluded DNA evidence collected by the Denver police in the execution of a Crim. P. 41.1 order of the Denver County Court, on grounds that they sought the order, at least in part, for the benefit of the prosecution in this case, and that after filing a motion to admit evidence of an uncharged Denver assault in this case, the prosecution was permitted to acquire non-testimonial identification evidence from the defendant, even to verify his identity as a perpetrator in the Denver assault, only according to Crim. P. 16 II(a)(2), governing discovery in this case.

¶ 2 Because the defendant's *Miranda* waiver effectively waived his right to counsel as guaranteed by not only the Fifth but also the Sixth Amendment, the district court erred in suppressing statements as a violation of the defendant's Sixth Amendment right to counsel. Because Crim. P. 16 II imposes disclosure obligations on criminal defendants without simultaneously barring the use of evidence acquired through otherwise lawful investigation, the district court erred in finding a discovery violation and excluding DNA evidence. The district court's suppression order is therefore reversed, our rule is made absolute, and the case is remanded for further proceedings consistent with this opinion.

I.

¶ 3 In 2011, Jesus Luna–Solis was charged in Arapahoe County with various counts of kidnapping, sexual assault, and conspiracy, arising from a sexual assault committed by multiple assailants in April 2003. Following a hearing and arguments of counsel, the district court issued a 23–page order, resolving a number of motions concerning the admissibility of evidence from the investigation of a 2002 sexual assault in Denver. The court found evidence of this as-yet-uncharged Denver assault generally admissible pursuant to section 16–10–301, C.R.S. (2011), and CRE 404(b), but it excluded certain evidence as having been obtained without notice to and outside the presence of defense counsel in this case. Specifically, the court excluded evidence of a match between samples obtained from the defendant and DNA discovered on the victim of the Denver assault as the sanction for a discovery violation, and in the same order it suppressed an incriminating statement concerning the Arapahoe County assault, made to the Denver police, as a violation of the defendant's Sixth Amendment right to counsel.

¶ 4 With regard to the similarity of the two assaults, the district court found that "the facts of the 2002 Denver sexual assault closely parallel those alleged in [this case], including an abduction of a female pedestrian late at night in the Denver metropolitan area by multiple males in an automobile, transport to a secluded area, oral and vaginal sexual assault, and subsequent abandonment." From the documents submitted to and relied on by the court in ruling on this group of motions, it appeared that the prosecution's theory of admissibility was premised on the proposition that if the defendant and another man were

accomplices in committing a very similar sexual assault, relatively close in time and location to the one for which the defendant is charged in this case, and it could be shown that the other man was one of those involved in the commission of this assault, it would be reasonable to infer that the defendant was also the other man's accomplice in this assault as well. The prosecution's interest in supporting this theory by demonstrating that the defendant was the second assailant in the Denver assault led to the court's evidentiary rulings now challenged on review.

¶ 5 The record on appeal indicates that although both sexual assaults remained unsolved for a number of years, DNA left in both assaults was matched to the same unknown assailant. Unlike the Arapahoe assault, in which DNA from only one of the assailants was recovered, in the Denver assault DNA was also recovered from a second assailant. As the result of an otherwise unrelated conviction in another jurisdiction, a 2009 tentative DNA computer (CODIS) match pointed to the defendant in this case as the second assailant in the Denver assault. After additional investigation, including a photographic line-up at which the Arapahoe assault victim picked the defendant as one of her assailants, the current charges were brought in Arapahoe County.

¶ 6 In addition to moving to admit evidence of the Denver assault as uncharged criminal misconduct, the Arapahoe prosecutors moved pursuant to Crim. P. 16 II(a)(2) for non-testimonial identification, in order to confirm the tentative match in the Denver assault, and a DNA sample was therefore obtained from the defendant by the Aurora police. Because the Denver Crime Lab, however, declined to rely on samples not obtained by its own department, and because Denver had by then reopened its own investigation of the 2002 assault, Denver detectives obtained a Crim. P. 41.1 order for non-testimonial identification from the Denver County Court and executed it without notifying the defendant's counsel in this ongoing prosecution. When the sample obtained pursuant to that order was subsequently analyzed by the Denver Crime Lab, it was determined to match the DNA profile for the second assailant on file in the 2002 Denver assault case. If the DNA evidence were credited by the trier of fact, it therefore would provide powerful evidence that the defendant and another unnamed man committed the Denver assault together and that this other man, along with at least one accomplice, committed the similar Arapahoe assault.

¶ 7 Prior to executing the non-testimonial identification order, the Denver detectives interviewed the defendant at the Arapahoe County jail, where he was already in custody. The district court below found that the defendant was brought to an interview room and told that the detectives wanted to discuss a 2002 Denver sexual assault. Although the defendant initially responded that he should probably have an attorney, and the detectives therefore turned to pack up their recording device and simply collect the DNA sample, the defendant then "voluntarily and without solicitation or encouragement engaged Detective Garcia about the 2002 sexual assault case." The court found that following a full advisement and waiver of his *Miranda* rights, the ensuing interview neither violated the defendant's rights under *Miranda* nor resulted in any involuntary statements.

¶ 8 Notwithstanding compliance by the Denver police with the Denver court's Crim. P. 41.1 order and the dictates of Miranda, the district court below excluded from this prosecution evidence derived from the DNA sample obtained by the Denver police and suppressed one particular sequence of questions and answers from the defendant's interview with them.

¶ 9 With regard to the DNA sample, the court reasoned that once the prosecutor in this case filed a motion to admit evidence of the Denver assault, any facts supporting the defendant's guilt of that assault would also be evidence of his guilt of the Arapahoe County assault, and therefore in developing evidence concerning the Denver assault, the prosecution was obliged to comply with the discovery rules governing this prosecution. Finding that the Denver detectives were aware that evidence developed for the Denver case would also be offered in this case, the court concluded that any non-testimonial identification testing concerning the Denver assault

required advance notice to defense counsel in this case, as would have been the case had the prosecution sought an order pursuant to Crim. P. 16 II(a)(2). Alternatively, the court found simply that the Denver police were acting as agents of the Arapahoe prosecutor in developing evidence for this case, and therefore the discovery rules governing this case controlled over the procedural requirements of any other vehicle for acquiring nontestimonial identification.

¶ 10 With regard to the interview by the Denver police, the court found that they violated the defendant's Sixth Amendment right to counsel by questioning him about a case in which he was already charged and represented by counsel. In the particular exchange at issue, the detectives asked the defendant whether he ever owned a car. When he responded that although he never owned a car, he had at some point been lent one, they pursued him concerning its make and model, and the defendant indicated the car was a yellow Lincoln. Because the victim in the Denver assault had been unable to identify her assailants' vehicle, but the victim in the Arapahoe assault had identified it as a yellow Lincoln, the district court found that, in conjunction with their awareness of the Arapahoe prosecutor's intent to admit evidence from the Denver investigation, their awareness of the Arapahoe victim's description demonstrated that the Denver police were really interrogating the defendant about the Arapahoe assault, which the court further found they were prohibited from doing outside the presence of the defendant's attorney in the Arapahoe prosecution.

¶ 11 Following the district court's order concerning "Prior Act Evidence," which included both the suppression of statements made by the defendant as a violation of his constitutional right to counsel and the exclusion of DNA evidence as a sanction for a discovery violation, the People brought an interlocutory appeal pursuant to section 16–12–102(2), C.R.S. (2012), and C.A.R. 4.1, and also petitioned this court pursuant to C.A.R. 21 to expand the scope of its review to include the discovery aspect of the district court's ruling. We granted the petition and issued our rule to show cause.

## II.

¶ 12 We have previously noted the narrowness of the interlocutory appeal of right provided prosecutors in this jurisdiction according to C.A.R. 4.1, restricted as it is to rulings on motions pursuant to Crim. P. 41(e) and (g), and Crim. P. 41.1. *See, e.g., People v. Braunthal,* 31 P.3d 167, 171 (Colo.2001). While the enactment of and amendments to section 16–12–102(2), C.R.S. (2012), have clearly expanded the scope of the prosecutor's right of interlocutory appeal, *see, e.g., People v. Reed,* 132 P.3d 347, 351 (Colo.2006) (finding of improper venue subject to interlocutory review pursuant to section 16–12–102(2)), in the absence of argument seeking to distinguish the statute from the rule, we have limited our review according to the scope of the latter. *See People v. Casias,* 59 P.3d 853, 855 n. 2 (Colo.2002). We have, however, also made clear our discretion to exercise our original jurisdiction to review even rulings falling outside the scope of C.A.R. 4.1, and have done so on a number of occasions where the ruling in question may have a significant impact on a party's ability to litigate the merits of a controversy or where an appellate remedy would not be adequate, including especially rulings excluding evidence for prosecutorial destruction, *see Casias,* 59 P.3d at 856; *Braunthal,* 31 P.3d at 172, or as a sanction for some other discovery violation, *see In re People v. Lee,* 18 P.3d 192 (Colo.2001) (exclusion of DNA match for late disclosure).

¶ 13 Although the broader order at issue in this case purported to rule on "Motions to Introduce Prior Act Evidence," both aspects of that order being challenged exclude incriminating evidence for the reason that it was acquired from the defendant without notification or the presence of his Arapahoe County counsel. The district court's ruling would clearly have a significant impact on the prosecution's ability to prove its case, *see Lee,* 18 P.3d at 198 ("DNA evidence that is subjected to appropriate discovery and cross-examination may be the most reliable evidence of the defendant's presence at the crime scene."), and if erroneous, jeopardy guarantees preventing retrial following an

acquittal would render an appeal after trial an inadequate remedy. As we have done with similar matters in the past, we therefore consider it appropriate to review the district court's full order before trial, even though it may not neatly fall within the scope of an interlocutory appeal pursuant to C.A.R. 4.1.

## III.

¶ 14 There can be no doubt that the Sixth Amendment guarantees a criminal defendant the right to have counsel present at interviews with law enforcement authorities after adversary judicial process has been initiated. *Montejo v. Louisiana,* 556 U.S. 778, 786, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009); *Patterson v. Illinois,* 487 U.S. 285, 290, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). And once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect. *Patterson,* 487 U.S. at 290 n. 3, 108 S.Ct. 2389; *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). A defendant, however, may waive that right, whether or not he is already represented by counsel, and the decision to waive need not itself be counseled. *Montejo,* 556 U.S. at 786, 129 S.Ct. 2079; *People v. Vickery,* 229 P.3d 278, 281 (Colo. 2010).

¶ 15 Further, the Sixth Amendment right is not superior to or greater than the right to counsel rooted in the Fifth Amendment privilege against self-incrimination in any manner that would make the former more difficult to waive than the latter. *Patterson,* 487 U.S. at 298, 108 S.Ct. 2389. When a defendant is read his *Miranda* rights, which include the right to have counsel present during interrogation, and agrees to waive those rights, that waiver will typically satisfy the Sixth as well as the Fifth Amendment. *Montejo,* 556 U.S. at 786, 129 S.Ct. 2079; *Patterson,* 487 U.S. at 293, 108 S.Ct. 2389; *Vickery,* 229 P.3d at 281. Al-though the Sixth Amendment right is offense-specific, applying only to charged offenses as distinguished from the investigation of any offense whatsoever, *see McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Vickery,* 229 P.3d at 280, a knowing and intelligent waiver of the Sixth Amendment right to counsel does not require, any more than does the Fifth, an awareness of the particular offense being investigated. *See Patterson,* 487 U.S. at 293, 108 S.Ct. 2389; *Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). And while it was once the case that a separate "bright-line" rule barred the police from questioning a defendant, unless he initiated the contact, following invocation of his Sixth Amendment right to counsel, *see Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), the Supreme Court has now made clear that the *Edwards* bright-line rule,[1] developed to protect defendants from the coercive pressures of custodial interrogation, is alone sufficient to ensure that a defendant will not be further interrogated once he requests the presence of counsel, as guaranteed by either the Fifth or Sixth Amendment. *Montejo,* 556 U.S. at 794, 129 S.Ct. 2079 (overruling *Jackson*).

¶ 16 Although the defendant in this case arguably invoked his right to counsel, the district court found that the Denver detectives complied with the *Edwards* bright-line rule by withdrawing, and only after the defendant initiated contact on his own did they question him further.[2] The court further found that before any questioning, the detectives obtained an effective waiver of the defendant's *Miranda* rights and did nothing during questioning to render the defendant's statements involuntary. Rather, the court made perfectly clear its belief that the Denver detectives were forbidden from questioning the defendant about an offense for which he was already charged and represented by counsel, outside the presence of that counsel.

---

1. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

2. The district court actually made reference to the "scrupulously honored" standard from *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), applying to invocation of the right to remain silent, but it nevertheless clearly found that the detectives did not question the defendant until he reinitiated contact with them by voluntarily engaging Detective Garcia about the 2002 Denver assault.

Whether it failed to appreciate that the defendant's Sixth Amendment right to counsel could be waived at all, or simply that his knowing, voluntary, and intelligent waiver of *Miranda* rights waived his Sixth Amendment right as well, the district court's factual findings and conclusions of law concerning the defendant's waiver of his *Miranda* rights demonstrate that it erred in finding a violation of his Sixth Amendment right to counsel.

¶ 17 Because the defendant initiated contact with the Denver detectives and waived his right to counsel, it was inconsequential for purposes of the Sixth Amendment whether the detectives knew of the prosecutor's motion to admit evidence from the Denver investigation or whether they actually sought, for whatever reason, to obtain information from the defendant about the offense charged in this case, and it was equally inconsequential whether they were aware the defendant was represented by counsel in this prosecution. Nothing in our holding, however, should be understood as implying anything about an attorney's ethical obligation to communicate with a person known to be represented about the subject of that representation only with the consent of his lawyer. *See* Colo. RPC 4.2 and 8.4(a); *In re People v. Wright,* 196 P.3d 1146 (Colo.2008). Nor should it be understood to in any way retreat from our holding in *People v. Harris,* limiting the use of non-testimonial identification orders as a vehicle for conducting custodial interrogations on less than probable cause. 762 P.2d 651, 658 (Colo.1988). Because neither was the subject of the district court's findings or conclusions, and in fact neither was asserted, below or on review in this

court, as a basis for excluding the defendant's statements, neither is properly before this court.[3]

## IV.

¶ 18 The Colorado Rules of Criminal Procedure provide two different procedural vehicles for acquiring non-testimonial identification evidence. Following the Supreme Court's suggestion in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), that under narrowly circumscribed procedures, limited intrusions based on less than probable cause might be constitutionally permissible, this court adopted Crim. P. 41.1. *See Harris,* 762 P.2d at 653. By its own terms, the rule authorizes an order for various kinds of non-testimonial identification, to be issued by "any judge" of the Supreme, District, Superior, County Court, or Court of Appeals, upon a request by sworn affidavit, any time "prior to the arrest of a suspect, after arrest and prior to trial or, when special circumstances of the case make appropriate, during trial," establishing that there is probable cause to believe an offense has been committed, there are reasonable grounds, not amounting to probable cause, to suspect that the subject of the order committed the offense, and the results of specific non-testimonial identification procedures will be of material aid in determining whether that person committed that particular offense. Crim. P. 41.1(a)–(c). In addition, both the application and the order itself must comply with a number of specific requirements, reflecting the extremely limited nature of intrusions that may be authorized on less than probable

**3.** We have often, in varying degrees of detail, noted with favor the proposition that on appeal a party may defend the judgment of the trial court on any ground supported by the record, whether or not that ground was relied on by the trial court, as long as the party's rights are not increased under the judgment. *See, e.g., People v. Aarness,* 150 P.3d 1271, 1277 (Colo.2006); *People v. Quintana,* 882 P.2d 1366, 1371 (Colo.1994) (relying on *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)); *Farmers Grp., Inc. v. Williams,* 805 P.2d 419, 428 (Colo.1991) (relying on *Smith v. Phillips,* 455 U.S. 209, 215 n. 6, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). In this case we need not more specifically parse the limits of that proposition or the extent to which it might be applicable to a statu-

torily limited interlocutory appeal by the prosecution because the record fails to support other grounds for suppression in any event. With regard to exceeding the scope of a Crim. P. 41.1 order in particular, not only does the record clearly reflect that the Denver police had access to the defendant for questioning by reason of his confinement pending trial in Arapahoe County; it also includes factual findings of the district court to the effect that the defendant's statements to the police preceded any attempt on their part to execute an order for non-testimonial identification, as well as the court's explicit ruling that apart from that portion of the interview the court considered to violate the Sixth Amendment, the defendant's interview with the Denver police would not be suppressed.

cause. *See People v. Madson,* 638 P.2d 18, 31–32 (Colo.1981). Perhaps most notably, we have held that custodial interrogation is prohibited, notwithstanding an effective waiver of *Miranda* rights, in the course of executing a Crim. P. 41.1 order, where custody over a suspect has been acquired on less than probable cause. *Harris,* 762 P.2d at 656–57.

¶ 19 By contrast, Crim. P. 16, governing discovery procedures before trial and enumerating the disclosure obligations of both prosecution and defense, grants the trial court, in particular judicial proceedings, the discretion to order the same non-testimonial identification procedures, subject only to constitutional limitations. Crim. P. 16 II(2)(a). The rule also makes express, however, that whenever the personal appearance of the defendant is required in order to execute such a discovery order, the prosecuting attorney must provide reasonable notice of the time and place of such appearance to both the defendant and his counsel. Crim. P. 16 II(2)(b). We have previously noted that Crim. P. 16 governs a prosecution request for non-testimonial identification procedures once judicial proceedings have been initiated, *see People v. District Court,* 664 P.2d 247, 250 n. 5 (Colo.1983), and cited with approval the decision in *People v. Angel,* 701 P.2d 149, 150–51 (Colo.App.1985), interpreting that statement to relieve the prosecutor and court of compliance with the requirements of Crim. P. 41.1 once criminal proceedings have begun, *see People v. Diaz,* 53 P.3d 1171, 1173 n. 6 (Colo.2002).

¶ 20 Although we have never actually upheld the exclusion of non-testimonial identification evidence that would otherwise be authorized by Crim. P. 41.1, simply for the reason that the order did not issue until the commencement of judicial proceedings, we have observed, without further elaboration, that after the initiation of judicial proceedings, the prosecution must proceed pursuant to Crim. P. 16. *Id.* Rather than implying any self-imposed time limitation in Crim. P. 41.1 itself, a notion easily dispelled by the express language of the rule, or that Crim. P. 16

somehow restricts or channels further investigation once formal proceedings have begun, this observation merely recognizes that the existence of alternate legal process for subjecting a defendant to non-testimonial identification in no way relieves a prosecutor of the ethical obligations attorneys owe to both the tribunal and opposing counsel. We have certainly never suggested that a prosecutor violates Crim. P. 16 II(a)(2) by failing to ensure that defense counsel is notified of the time and place a law enforcement agency from another judicial district will execute a non-testimonial identification order of a court in that district, concerning a different offense altogether.

■ ¶ 21 The district court excluded evidence derived from the DNA sample gathered by the Denver detectives as a sanction for the prosecutor's failure to provide notice of Denver's plans to the defendant's attorney, which it characterized as a failure "to comply with the spirit and letter of" Crim. P. 16 II(a)(2).[4] It was clearly defense counsel's inability to contemporaneously advise his client regarding further interrogation with which the court was concerned, rather than any suggestion that the sample may have been improperly collected or that the prosecutor was violating or circumventing an earlier court order. We need not address the propriety of excluding DNA evidence as a sanction for this reason, *see generally Lee,* 18 P.3d at 196; *People v. District Court,* 808 P.2d 831, 836–37 (Colo.1991); *People v. District Court,* 793 P.2d 163, 167–68 (Colo.1990), because the prosecutor's failure to provide reasonable notice to the defendant and defense counsel of the time and place the Denver police would execute the Denver court's Crim. P. 41.1 order did not amount to a violation of Crim. P. 16 at all, whether or not he was in possession of that knowledge.

¶ 22 The district court reasoned that upon formally filing notice of its intent to introduce evidence of uncharged criminal misconduct, the prosecution acquired an obligation to notify defense counsel of the development of that evidence, including any non-testimonial

---

4. While it is not entirely clear from the language of the district court's order that it intended to bar further testing or evidence of a match with any

other sample of the defendant's DNA, that is the implication of the order, and the understanding of the parties to this review proceeding.

identification procedure; and in the alternative that the prosecution was required to provide such notice, in any event, because the "primary motive" of the Denver police, despite having independent motives of their own, was to assist in the development of evidence for this prosecution. Although the premise for the latter rationale is strongly contested, even if we were to find it adequately supported in the record, the court's legal conclusion would be supported by neither rationale. While a prosecutor may not violate his ethical obligations to the court or opposing counsel, either alone or through the acts of another, see Colo. RPC 8.4, nothing in the language of Crim. P. 16 or our prior case law suggests that a prosecutor commits a discovery violation by encouraging the investigation of other, uncharged offenses through lawful court orders, whether or not such investigation may have relevance for his current prosecution.

## V.

¶ 23 Because the defendant's *Miranda* waiver effectively waived his right to counsel as guaranteed by not only the Fifth but also the Sixth Amendment, the district court erred in suppressing statements as a violation of the defendant's Sixth Amendment right to counsel. Because Crim. P. 16 II imposes disclosure obligations on criminal defendants without simultaneously barring the use of evidence acquired through otherwise lawful investigation, the district court erred in finding a discovery violation and excluding DNA evidence. The district court's suppression order is therefore reversed, our rule is made absolute, and the case is remanded for further proceedings consistent with this opinion.

CHIEF JUSTICE BENDER concurs in part and dissents in part, and JUSTICE HOBBS joins in the concurrence in part and dissent in part.

CHIEF JUSTICE BENDER, concurring in part and dissenting in part.

¶ 24 The majority holds that the district court erred in suppressing Luna–Solis's statements under the Sixth Amendment. Maj. op. ¶ 16. I agree that the district court

erred in its analysis, but I disagree with the majority's ultimate conclusion. In my view, the district court correctly suppressed Luna–Solis's statements because they were obtained in violation of his rights under the Fourth Amendment and article II, section 7 of the Colorado Constitution when Denver detectives illegally expanded the scope of the Crim. P. 41.1 order by interrogating him.

¶ 25 The majority also holds that the district court erred in barring the use of the DNA evidence at trial as a discovery sanction under Crim. P. 16. Maj. op. ¶ 21. The majority appears to reason that no Crim. P. 16 violation occurred because the Denver detectives were from "another judicial district," and the Crim. P. 41.1 order "concern[ed] a different offense." *Id.* 20. I agree with the majority's conclusion that no discovery violation occurred but write separately to explain why. In my view, no discovery violation occurred because Crim. P. 16 applies to judicial proceedings, and judicial proceedings had not been initiated against Luna–Solis stemming from the Denver assault.

¶ 26 My analysis is driven by the operation of Crim. P. 41.1 and Crim. P. 16 II(a) and what each rule is designed to do. Crim. P. 41.1 allows for limited detentions of suspects on less than probable cause, and our precedent prohibits police from expanding the scope of that rule to interrogate a suspect. By failing to undertake a Fourth Amendment analysis, the majority undermines Luna–Solis's rights under that constitutional provision while expanding, by implication, the narrowly defined circumstances under which Crim. P. 41.1 detentions are constitutionally permissible.

¶ 27 Hence, I respectfully dissent from Part III of the majority opinion and concur in the result as to Part IV.

## I. Background

¶ 28 Before addressing the issues presented in this case, a brief review of the relevant facts is helpful.

¶ 29 In 2002, in Denver, two people kidnapped a woman off the street, drove her to

a remote location, and sexually assaulted her—the Denver assault. Denver investigators recovered DNA from both but were unable to identify them and logged their DNA profiles into a national database.

¶ 30 About a year later, a woman was kidnapped, driven to a remote location, and sexually assaulted—the Arapahoe assault. Investigators recovered one person's DNA, which matched the DNA of the first unknown person involved in the Denver assault, but both the Denver assault and the Arapahoe assault went unsolved.

¶ 31 Years later, as a result of an unrelated conviction in Arizona, defendant Jesus Luna–Solis's DNA profile was logged into a national database, which resulted in a match with the DNA of the second unknown person involved in the Denver assault. Perhaps thinking that the same people committed both the Denver and Arapahoe assaults, Aurora police in charge of investigating the Arapahoe assault contacted the Arapahoe assault victim and showed her a photographic lineup that included Luna–Solis. She identified Luna–Solis as one of her attackers. He was arrested, charged with multiple crimes stemming from the Arapahoe assault, and detained in the Arapahoe County detention facility to await trial.

¶ 32 As the Arapahoe case progressed, Denver police began a renewed investigation into the Denver assault. To confirm the DNA match, a deputy district attorney in Denver obtained a Crim. P. 41.1 order, which permitted the limited detention of Luna–Solis to collect nontestimonial identification evidence from him.

¶ 33 Without notifying Luna–Solis's counsel in the Arapahoe case, two Denver detectives arrived at the Arapahoe County detention facility to execute the Crim. P. 41.1 order. As Detective Garcia testified at the Arapahoe assault suppression hearing, she and her partner sought to "interview Mr. Solis, if he was willing to [talk]." At the detectives' request, Luna–Solis was brought to an interview room. Detective Garcia testified she told Luna–Solis that they were there "to talk to him about a sex assault that occurred in Denver." In response, Luna–Solis stated that he should have an attorney.

According to Detective Garcia's testimony, the detectives then began to "pack up" and "proceed to execute the 41.1," but Luna–Solis asked, "What is the sex assault about?" Detectives told Luna–Solis that they could not ask him questions unless he waived his right to an attorney. They advised Luna–Solis of his rights under *Miranda,* which he waived orally and in writing. The detectives then interrogated Luna–Solis for about twenty-five minutes. At the end of the interrogation, they executed the Crim. P. 41.1 order by obtaining his saliva sample.

¶ 34 After pretrial hearings raising various evidentiary motions, the district court suppressed a portion of Luna–Solis's statements to the Denver detectives on Sixth Amendment grounds. The court reasoned that, despite Luna–Solis's request for counsel, his *Miranda* waiver was valid because he "voluntarily and without solicitation or encouragement" engaged the Denver detectives in conversation by asking about the Denver assault. However, the court suppressed several of his statements because it reasoned that the detectives were questioning Luna–Solis about the Arapahoe assault, for which he was represented by counsel, and not the Denver assault, for which he was not. The court also suppressed the DNA evidence obtained by the detectives as a sanction for a discovery violation under Crim. P. 16 because Luna–Solis's counsel was not notified of the time and place that the Crim. P. 41.1 order would be executed.

## II. Crim. P. 41.1 and Crim. P. 16

¶ 35 Because this case requires an examination of Crim. P. 41.1 and Crim. P. 16 and what those rules are designed to accomplish, I begin with a brief discussion of those rules.

¶ 36 We adopted Crim. P. 41.1 after the United States Supreme Court suggested, in dicta, that limited detentions for fingerprinting might be constitutionally permissible under the Fourth Amendment on less than probable cause, provided that a judicial officer pre-authorized the detention. *See Davis v. Mississippi,* 394 U.S. 721, 727–28, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Under Crim. P. 41.1, an order for collection of nontestimonial

identification evidence must be based on specific and articulable facts set forth in an affidavit establishing that (1) there is probable cause to believe that an offense has been committed; (2) there are "reasonable grounds," not amounting to probable cause, to believe that the suspect committed the offense; and (3) the nontestimonial identification evidence will be of material aid in determining whether the suspect committed the offense. To uphold the constitutionality of Crim. P. 41.1, we stressed the "narrowly defined circumstances" under which such limited detentions are constitutionally permissible. *People v. Madson,* 638 P.2d 18, 31–32 (Colo.1981). And, in *People v.* Harris, we held that the Fourth Amendment prohibits interrogating a suspect while executing a Crim. P. 41.1 order. 762 P.2d 651, 659 (Colo. 1988).

¶ 37 Crim. P. 16 regulates discovery in criminal trials. Crim. P. 16 II(a)(1) permits the district court, "upon request of the prosecuting attorney," to require the "accused" to provide nontestimonial identification evidence. Crim. P. 16 II(a) does not contain the specific restrictions found in Crim. P. 41.1, but it is circumscribed by "constitutional limitations" and the district court's discretion. Unlike Crim. P. 41.1, it also requires the prosecuting attorney to provide notice to the accused and his or her counsel of the time and place that the nontestimonial identification evidence will be collected.

¶ 38 Crim. P. 41.1 and Crim. P. 16 II(a) both concern collecting nontestimonial identification evidence, and they outline different procedures for doing so. As noted, Crim. P. 41.1 outlines the procedure for detaining a suspect on less than probable cause to collect nontestimonial evidence. By its terms, Crim. P. 41.1 applies when police do not have probable cause to arrest a suspect on the allegations for which nontestimonial identification evidence is sought.

¶ 39 By contrast, Crim. P. 16 is a discovery rule, and discovery rules apply to judicial proceedings. The reference in Crim. P. 16 II(a) to obtaining evidence from an "accused," rather than a suspect, presupposes that charges have been filed. Its provision requiring notice to the accused's counsel assumes that the accused has the right to counsel, which attaches, under the Sixth Amendment, when charges are filed. *See People v. Vickery,* 229 P.3d 278, 280 (Colo. 2010). By its terms, Crim. P. 16 applies once judicial proceedings have been initiated. *See People v. Dist. Court,* 664 P.2d 247, 250 n. 5 (Colo.1983).

¶ 40 With this basic framework in mind, I turn to an analysis of the issues presented in this case.

## III. Suppression of Statements

¶ 41 The majority holds that the district court erred in suppressing Luna–Solis's statements under the Sixth Amendment. Maj. op. ¶ 16. I agree with the majority that the district court erred in its analysis, but I would affirm the district court's suppression order because Luna–Solis's statements were obtained in violation of his rights under the Fourth Amendment, its Colorado counterpart, and our decision in *People v. Harris.*

¶ 42 In *Harris,* we addressed the constitutionality of when police question a suspect detained on less than probable cause to arrest pursuant to Crim. P. 41.1. In that case, police picked up a suspect from his workplace, detained him under Crim. P. 41.1, and transported him to the hospital to obtain nontestimonial identification evidence. *Harris,* 762 P.2d at 652. While en route, a police officer advised the suspect of his *Miranda* rights and then interrogated him about his actions and whereabouts on the night when a sexual assault was alleged to have taken place. *Id.* In response to the officer's questions, the suspect provided details about where he had been and what he had been doing on the night in question. *Id.* The officer later testified that he had planned to interrogate the suspect while executing the Crim. P. 41.1 order. *Id.* at 653.

¶ 43 We held that the Fourth Amendment and its Colorado counterpart prohibit police from interrogating a suspect detained on less than probable cause pursuant to Crim. P. 41.1. *Id.* at 658. We noted that Crim. P. 41.1 permits law enforcement to acquire nontestimonial identification evidence only when collection of that evidence "involves none of

938

the probing into an individual's private life and thoughts that marks an interrogation or search." *Id.* at 654–55 (quoting *Davis,* 394 U.S. at 727, 89 S.Ct. 1394). Given the narrowly defined circumstances under which such limited detentions are constitutionally permissible, we concluded that that rule "simply does not authorize a police officer to intentionally and purposefully elicit information from a criminal suspect." *Id.* at 658. Thus, we held in that case, the police's questioning of the suspect illegally expanded the limited seizure authorized by the Crim. P. 41.1 order beyond what the Fourth Amendment and its Colorado counterpart allow. *Id.* at 658.

¶ 44 Having determined that police are constitutionally prohibited from interrogating a suspect detained under Crim. P. 41.1 on less than probable cause, we next considered whether *Miranda* warnings "sufficiently attenuated the taint of the illegally expanded detention." *Id.* Relying on *Brown v. Illinois,* we concluded that *Miranda* warnings do not necessarily purge the taint of an underlying Fourth Amendment violation because the exclusionary rule, when used to effectuate the Fourth Amendment, serves interests and policies distinct from those it serves under the Fifth. *Id.* (citing *Brown v. Illinois,* 422 U.S. 590, 600–01, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). The fact that a suspect received proper *Miranda* warnings is therefore "only a threshold requirement for a fourth amendment analysis" because, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached. *See id.* at 659; *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(b), at 378–79 (2012). Beyond this threshold requirement, we identified several factors from *Brown* to consider when determining whether statements are obtained by exploiting an illegally expanded detention: "The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Harris,* 762 P.2d at 659 (quoting *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254).

¶ 45 To analyze these factors, we reasoned that the suspect in *Harris* began making inculpatory statements immediately after being taken into custody, that there was "no time for any intervening circumstances between the arrest and [the suspect's] statements," and that the police, by admission, had intended to interrogate the suspect while executing the Crim. P. 41.1 order. *Id.* Thus, we suppressed the suspect's statements because they "resulted from the illegal expansion of the Crim. P. 41.1 order." *Id.* Under these circumstances, to admit as evidence the suspect's statements would allow "law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the procedural safeguards of the Fifth." *Id.* (quoting *Dunaway,* 442 U.S. at 219, 99 S.Ct. 2248).

¶ 46 Turning to this case, I note that the Denver County Court Crim. P. 41.1 order executed by the Denver detectives reflects the constitutional constraints set forth in *Harris.* The order directed Denver police to take Luna–Solis "into custody" on less than probable cause "for the purpose of completing the specific non-testimonial identification procedures" of obtaining a saliva or blood sample. It admonished police to complete the procedure "as expeditiously as possible" and mandated that "said Defendant [Luna–Solis] is to be detained pursuant to this Order no longer than it takes to obtain the said non-testimonial identification." The order authorized Denver police to collect nontestimonial identification evidence but nothing more. Despite this order, Denver detectives detained Luna–Solis in a separate interview room in the Arapahoe County detention facility. They told him that they were there to interrogate him about the Denver assault and questioned him for about twenty-five minutes before executing the Crim. P. 41.1 order. Similar to the circumstances in *Harris,* Luna–Solis began making statements almost immediately after being detained, there was "no time for any intervening circumstances," and the Denver detectives, by admission, intended to interrogate Luna–Solis while executing the Crim. P. 41.1 order. *See id.*

¶ 47 Luna–Solis's question to the Denver detectives about the Denver assault and his later *Miranda* waiver do not represent the kind of "intervening circumstances" contemplated by *Brown* or *Harris*. Rather, those facts, together with the district court's finding that Luna–Solis "voluntarily and without solicitation or encouragement" engaged Detective Garcia in conversation, are relevant to whether he voluntarily waived his Fifth Amendment rights under the additional safeguards applicable after invoking his right to counsel. *See People v. Ferguson,* 227 P.3d 510, 513 (Colo.2010) (concluding that a suspect who "volitionally initiated conversation" with police after requesting counsel validly waived his *Miranda* rights (citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981))). Because "the voluntariness inquiry is merely a threshold inquiry [and] is not interchangeable with the attenuation inquiry" under the Fourth Amendment, Luna–Solis's question and *Miranda* waiver did not constitute intervening circumstances sufficient to attenuate the taint of the illegally expanded detention. *See People v. Lewis,* 975 P.2d 160, 175 (Colo. 1999) (reasoning that no intervening circumstances occurred between the defendant's illegal arrest and the time he made statements because he was not taken before a magistrate and did not meet with counsel); *Harris,* 762 P.2d at 658–59; *see also* 6 LaFave, *Search and Seizure* § 11.4(b), at 387–90.

¶ 48 Further, Luna–Solis did not "volunteer" information by asking a question of the Denver detectives about the Denver assault. In *Harris,* we left open the possibility that some statements of detained suspects may be admissible "where a suspect initiates a conversation with the police and, despite a lack of coercion or interrogation, voluntarily offers them information." *Harris,* 762 P.2d at 657. Here, however, Luna–Solis neither initiated a conversation with the Denver detectives nor volunteered information. His statements were made in response to questions by Denver detectives while he was detained under the Crim. P. 41.1 order. *Cf. People v. Wilson,* 841 P.2d 337, 340 (Colo.App.1992) (upholding admission of defendant's statements made during nontestimonial identification procedure where he initiated a conversation

tion with police and police had not intended to interrogate him).

¶ 49 Luna–Solis's presence in the Arapahoe County detention facility awaiting trial does not alter this analysis under the facts of this case. Luna–Solis was in custody awaiting trial on charges stemming from the Arapahoe assault, for which probable cause existed. He was not in custody based on the Denver assault, and Denver police lacked probable cause to arrest Luna–Solis for the Denver assault. Under these circumstances, and consistent with Crim. P. 41.1, the deputy district attorney in Denver proceeded under Crim. P. 41.1 to detain Luna–Solis on less than probable cause, and the Crim. P. 41.1 order reflects that Luna–Solis's limited detention was based on "reasonable grounds." Thus, the Denver detectives' actions to detain Luna–Solis in an interview room in the Arapahoe County detention facility are analogous to the police's actions to detain the suspect in *Harris* in the ambulance and hospital. In both cases, police detained suspects on less than probable cause to collect nontestimonial identification evidence, and, in both cases, the suspects were not free to leave until the Crim. P. 41.1 order was executed. Because Luna–Solis was detained on reasonable grounds, the Denver detectives were required to adhere to the constitutional mandates of *Harris* and the Crim. P. 41.1 order.

¶ 50 The majority does not dispute the import of *Harris.* Instead, after reversing the district court's suppression order on Sixth Amendment grounds, the majority conditions its holding so as not to undermine *Harris* or the constitutional rights it protects. Maj. op. ¶ 17. The majority does not engage in an analysis under *Harris* because it is not the subject of this review. *Id.*

¶ 51 My view is to the contrary. We have been asked to review the propriety of the district court's suppression order, and appellate courts have discretion to affirm the district court on grounds not raised by the parties or considered by the court. *Moody v. People,* 159 P.3d 611, 615 (Colo.2007); *People v. Aarness,* 150 P.3d 1271, 1277 (Colo.2006); *People v. Quintana,* 882 P.2d 1366, 1371 (Colo.1994). I would exercise that discretion

here, especially because the district court reached the correct result, albeit through an incorrect analysis.

¶ 52 Therefore, in light of *Harris,* I would suppress Luna–Solis's statements because they were obtained in violation of his constitutional rights under the Fourth Amendment and article II, section 7 of the Colorado Constitution. Hence, I respectfully dissent from Part III of the majority opinion.

### IV. Suppression of DNA Evidence

¶ 53 The majority next concludes that the district court erred in barring the prosecution from using the DNA evidence collected by the Denver detectives as a sanction for a discovery violation under Crim. P. 16. Maj. op. ¶ 21. I agree with the majority's conclusion but write separately to explain why.

¶ 54 In my view, no discovery violation occurred because Crim. P. 16, as a discovery rule, presupposes that judicial proceedings have been initiated against the defendant. It is undisputed that no judicial proceedings had been initiated against Luna–Solis stemming from the Denver assault. The deputy district attorney in Denver was under no obligation to provide Luna–Solis or his attorney with notice because he was proceeding under Crim. P. 41.1, which contains no notice requirement. He could not have notified Luna–Solis's counsel because Luna–Solis was not represented by counsel for the Denver assault, and Luna–Solis had no Sixth Amendment right to the assistance of counsel for the Denver assault. Under these circumstances, Luna–Solis is protected from interrogation by the Fourth Amendment (that is, *Harris*) and the Fifth Amendment (that is, *Miranda)* but not his Sixth Amendment right to counsel.

¶ 55 Therefore, I would conclude that the district court erred in suppressing the DNA evidence as a discovery sanction because Crim. P. 16 was inapplicable under these circumstances. Hence, I concur in Part IV of the majority opinion.

### V. Conclusion

¶ 56 For these reasons, I respectfully dissent from Part III of the majority opinion and concur in the result as to Part IV.

¶ 57 I am authorized to state that JUSTICE HOBBS joins in the concurrence in part and dissent in part.