Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
March 7, 2022

**2022 CO 11**

**No. 21SA110, *People v. Brown*—Criminal Law—Searches and Seizures—Probable or Reasonable Cause.**

In this interlocutory appeal, the supreme court affirms the trial court's order suppressing the defendant's statements following his detention by the police, albeit on different grounds. The supreme court concludes that while the trial court erred by considering the officers' subjective intent in effectuating the seizure, it was nonetheless correct that the officers lacked reasonable and articulable suspicion to detain the defendant.

# The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

## 2022 CO 11

### Supreme Court Case No. 21SA110
*Interlocutory Appeal from the District Court*
District Court, City and County of Denver, Case No. 20CR1359
Honorable Jay S. Grant, Judge

_____

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Alexander Brown.

_____

### Order Affirmed
*en banc*
March 7, 2022

_____

**Attorneys for Plaintiff-Appellant:**
Beth McCann, District Attorney, Second Judicial District
Victoria M. Cisneros, Deputy District Attorney
Richard F. Lee, Deputy District Attorney
*Denver, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Matthew E. Catallo, Deputy Public Defender
K. Alexis Sheek, Deputy Public Defender
*Denver, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE MÁRQUEZ**, **JUSTICE HOOD**, **JUSTICE GABRIEL**, **JUSTICE HART**, and **JUSTICE SAMOUR** joined.

JUSTICE BERKENKOTTER delivered the Opinion of the Court.

¶1 The People bring this interlocutory appeal under C.A.R. 4.1, challenging an order of the Denver District Court suppressing Alexander Brown's statements following his detention by the police. The trial court determined that the officers who detained Brown did not have a reasonable and articulable suspicion that a crime had been committed, was being committed, or was about to be committed.

¶2 We conclude that while the trial court erred in considering the officers' subjective intent in effectuating the seizure, it was nonetheless correct that the officers lacked reasonable and articulable suspicion to detain Brown. Accordingly, we affirm the trial court's order suppressing Brown's statements, albeit on other grounds.

## I.  Facts and Procedural History[1]

¶3 On February 18, 2020, Denver police officers Jesus Galvan and Christina King were patrolling the parking lot of an apartment complex in the area of East 26th Avenue and Martin Luther King Boulevard. During their patrol, the officers discovered a vehicle that had been involved in a hit-and-run accident and, next to it, two vehicles without license plates that the officers suspected were stolen.

[1] We derive the facts detailed in this section from the trial court's written findings in its suppression order and the transcript of the hearings on the motion to suppress.

3

Beside those vehicles, the officers noticed a red Ford Focus with temporary Colorado tags. Officer Galvan pulled the patrol vehicle partially behind the Ford Focus, blocking its exit. It was late in the evening and dark. The patrol car had its blue headlights on.

¶4 The officers observed two occupants seated in the vehicle and smoke emanating from the car's windows. Officer Galvan approached the driver-side door of the vehicle, while Officer King approached the passenger-side door. The officers made contact with the occupants, which Officer Galvan later testified was necessary "for officer safety" because they were going to be checking for vehicle identification numbers on the neighboring vehicles. Upon making contact with the driver, who identified himself as Alexander Brown, Officer Galvan noticed "a strong smell of burnt marijuana coming out of the vehicle."

¶5 Officer Galvan requested identification from both Brown and the passenger, along with registration and proof of insurance. After running Brown's information and clearing it through the system, Officer Galvan returned Brown's paperwork, and the following exchange took place:

Officer Galvan: Anything illegal in the car? Can I get your permission to check the car?

Brown: [Shakes head no.]

Officer Galvan: OK[] if I call a dog over here[?] [H]e isn't going to hit on narcotics[?]

Brown:          No sir.

Officer Galvan: Give me a minute, I'm going to call for a dog.  OK?
                Give me a second.

¶6      Officer Galvan then returned to his patrol car to call for a K-9 unit, but, after realizing that one would not be available, he decided not to make the call.  Instead, Officer Galvan returned to Brown's car, and Brown then admitted that he had marijuana in the vehicle.  Officer Galvan told Brown that he was "not worried about the weed."  Rather, Officer Galvan explained, he was worried about firearms and asked if Brown had any in the vehicle.

Brown:          No sir, you can check.

Officer Galvan:  I can check it for firearms?

Brown:          You can search me.

Officer Galvan:  Can I check the vehicle for firearms?

Brown:          Yes.

¶7      Brown then exited his vehicle, and Officer Galvan proceeded to pat him down for weapons.  The passenger then stated, "Hey I want to go back into my apartment, can I leave?"  Officer Galvan told her, "Yeah, you can leave if you want."  The passenger then opened the door and exited the vehicle. Officer Galvan testified that Officer King patted the passenger down for officer safety and, while doing so, discovered a handgun in the passenger's waistband.  Upon finding the firearm, Officer King shouted, "Gun, gun."  Brown immediately shouted, "Hey!

5

Hey! That's mine! That's mine!" Brown affirmed that the firearm belonged to him, and Officer Galvan then detained Brown with handcuffs, placed him in a patrol car, and advised him of his *Miranda* rights. After being read his rights, Brown again confirmed that the firearm was his and explained that he had given it to the passenger because he was scared.

¶8 Brown was charged with one count of possession of a weapon by a previous offender—juvenile offender.

¶9 Brown filed a motion to suppress the admission of the statements he made to the officers, asserting that he was subjected to an investigative detention unsupported by reasonable suspicion, which led to his formal arrest without probable cause in violation of his Fourth Amendment rights. At the suppression hearing, defense counsel elaborated, arguing that "from the very beginning of [the] encounter it was an investigatory stop based on the officers' actions, based on where they parked, [and] how they approached." Brown "would [not] have believed he was [] free to leave" because "Officer Galvan's squad car was parked behind Mr. Brown's in such a way that Mr. Brown could not back out without hitting the squad car."

¶10 Following multiple motions hearings, the trial court ruled that (1) the initial contact was consensual; (2) the encounter turned into an investigatory stop once Officer Galvan told Brown he was calling to have a dog brought to the scene;

6

(3) Brown did not have standing to challenge the search of the passenger, resulting in discovery of the firearm; and (4) Officers Galvan and King did not have reasonable and articulable suspicion that a crime had been committed, was being committed, or was about to be committed to justify the seizure. Specifically, the trial court found that because Officer Galvan indicated that he was not concerned with the marijuana, he lacked justification for seizing Brown. Thus, the trial court suppressed all statements obtained after Officer Galvan said he was calling for a dog, including Brown's statements that the firearm belonged to him.

¶11 The People then brought this interlocutory appeal.

## II. Analysis

¶12 We begin by addressing the basis for our jurisdiction and the appropriate standard of review. Next, we discuss the law and standards related to police-citizen encounters, the requirements for establishing reasonable and articulable suspicion for an investigatory stop, and the scope of this court's C.A.R. 4.1 review. We then apply these principles to the record before us and hold that, while the trial court erred by considering the officers' subjective intent, it was nonetheless correct that the officers lacked reasonable and articulable suspicion for the stop. Accordingly, we affirm the portion of the trial court's order suppressing Brown's statements, albeit on different grounds.

7

## A. Jurisdiction and Standard of Review

¶13     Section 16-12-102(2), C.R.S. (2021), and C.A.R. 4.1 allow the prosecution to file an interlocutory appeal with this court, seeking relief from a trial court's ruling granting a defendant's pretrial motion to suppress evidence.[2]   However, interlocutory relief under C.A.R. 4.1 is not available to defendants. *See People v. Bland*, 884 P.2d 312, 322 (Colo. 1994); *see also People v. Barton*, 673 P.2d 1005, 1006 n.1 (Colo. 1984) ("An interlocutory appeal by the People under C.A.R. 4.1 does not normally include issues raised by the defendant.").  When a trial court resolves a suppression issue against a defendant, this court has no jurisdiction to address it through an interlocutory appeal. *People v. Weston*, 869 P.2d 1293, 1297 (Colo. 1994).

¶14     On appeal, a trial court's suppression order presents a mixed question of law and fact. *People v. Chavez-Barragan*, 2016 CO 16, ¶ 9, 365 P.3d 981, 983.  We accept and defer to the trial court's findings of historical fact, if supported by competent evidence in the record. *Id.*  However, we review the trial court's conclusions of law de novo. *People v. Garcia*, 11 P.3d 449, 453 (Colo. 2000).

---

[2] Pursuant to C.A.R. 4.1(a), the People certify that this appeal "is not taken for purposes of delay" and that the suppressed evidence constitutes "a substantial part of the proof of the charge pending against the defendant" by establishing ownership of the firearm.  Brown does not object to this certification.

## B. The Three General Categories of Police-Citizen Encounters

¶15 The United States and Colorado Constitutions protect against "unreasonable searches and seizures." U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7. However, not all encounters between police officers and citizens implicate the Fourth Amendment's protections, as a seizure only occurs when a police officer, by means of physical force or show of authority, restrains a citizen's liberty. *See People v. Johnson*, 865 P.2d 836, 841 (Colo. 1994) (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Based on this understanding, "Colorado case law recognizes three general categories of police-citizen encounters: (1) arrest, (2) investigatory stop, and (3) consensual interview." *People v. Marujo*, 192 P.3d 1003, 1006 (Colo. 2008). Because consensual encounters are requests for "voluntary cooperation," they do not implicate the Fourth Amendment. *Id.* (quoting *People v. Jackson*, 39 P.3d 1174, 1179 (Colo. 2002)). Only arrests and investigatory stops are considered seizures that have such an implication. *Id.*

¶16 A person is seized for purposes of the Fourth Amendment when an officer terminates or restrains the person's freedom of movement through an intentional act. *See Tate v. People*, 2012 CO 75, ¶ 7, 290 P.3d 1268, 1269. To determine if a person's freedom of movement was sufficiently restrained to constitute a seizure, a court must ask whether, "in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave."

*Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

¶17 We have observed that "the boundary between consensual encounters and investigatory stops is crucial because it defines where the protection of the Fourth Amendment begins." *Marujo*, 192 P.3d at 1006 (quoting *Jackson*, 39 P.3d at 1179). "Reasonable suspicion for an investigatory stop exists when the facts demonstrate that a prudent officer has an articulable basis for suspecting that a defendant is involved in criminal activity." *People v. Brown*, 217 P.3d 1252, 1256 (Colo. 2009). A warrantless arrest—which may follow from an investigatory stop—is considered unreasonable unless it is supported by probable cause. *See People v. Castaneda*, 249 P.3d 1119, 1122 (Colo. 2011). Thus, any evidence subsequently obtained will only be admissible if officers had probable cause to make the underlying arrest. *Id.* However, probable cause to make an arrest may arise upon an officer's effectuation of an investigatory stop predicated on reasonable suspicion. *See Brown*, 217 P.3d at 1256. That is, an officer may observe something during the course of an encounter that gives rise to probable cause for arrest. *See id.* (finding probable cause to arrest for driving under the influence after an investigatory stop where the officer discovered the defendant unconscious behind the wheel of a running car and found further evidence of intoxication).

10

¶18 Whether probable cause exists "rests on all facts and circumstances known to the police at the time of the arrest." *Id.* The objective facts and circumstances leading to the arrest must "justify the belief that (1) an offense has been or is being committed (2) by the person arrested." *Castaneda*, 249 P.3d at 1122 (quoting *People v. Robinson*, 226 P.3d 1145, 1149 (Colo. App. 2009)); *see also Brown*, 217 P.3d at 1256 ("Probable cause for an arrest exists when there is a fair probability that the defendant has committed, is committing, or is about to commit a crime."). Moreover, because police officers "are entitled to draw appropriate inferences from circumstantial evidence," probable cause may exist despite proffered innocent explanations for the conduct. *Castaneda*, 249 P.3d at 1122.

### C. The Officers Lacked Reasonable and Articulable Suspicion to Conduct an Investigative Stop

¶19 With this framework in mind, we consider whether Officers Galvan and King had reasonable and articulable suspicion to conduct an investigative stop. This requires us, first, to examine when Brown was seized.

¶20 Recall that Brown and the passenger were sitting in the red Ford Focus in the parking lot of an apartment complex late at night. The Ford was legally parked between two unoccupied cars. Before contacting the two occupants seated in the Ford, the officers ran the car's temporary tags and confirmed that the car was not stolen. The car did not otherwise raise any suspicion. Nonetheless, when Officer Galvan pulled his patrol car behind Brown's vehicle, the patrol car — which had its

11

lights on—was close enough to the Ford so that Brown could not back his vehicle out of the parking space without hitting the patrol car. The position of the two vehicles can be seen in the image below, which was admitted as an exhibit during the suppression hearing.



¶21    This exhibit, along with Officer Galvan's testimony about the position of the patrol car in relation to the Ford, supports the trial court's finding that the patrol car blocked Brown's vehicle in. Thus, we accept and defer to the trial court's factual finding. *See Chavez-Barragan*, ¶ 9, 365 P.3d at 983. But we note this finding is at odds with the trial court's conclusion that the initial contact between the officers and Brown was consensual.

¶22    Both state and federal courts, when presented with similar facts, have consistently held that police seize the driver of a parked car for purposes of the Fourth Amendment when they effectively block the car's exit through intentional actions.  As the New Jersey Supreme Court has explained, "A person sitting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car . . . , only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave."  *State v. Rosario*, 162 A.3d 249, 255 (N.J. 2017); *see also State v. Edmonds*, 145 A.3d 861, 873 (Conn. 2016) ("It is well established that, when law enforcement officials block a suspect's vehicle so as to prevent him from driving off, they have, by that fact alone, executed a fourth amendment seizure."); *United States v. Jones*, 678 F.3d 293, 300–05 (4th Cir. 2012) (concluding that officers seized the defendant when they followed the defendant's vehicle from a public road to private property and effectively blocked the vehicle from exiting); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("Given the fact that [the police officer] blocked [the defendant's] car with his marked patrol car, a reasonable person in [the defendant's] position would not have felt free to leave."); 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 9.4(a) (6th ed. 2020) (noting that, while "mere approach and questioning" of persons seated in parked vehicle does not constitute seizure, "boxing the car in . . . will likely convert the event into a Fourth Amendment

13

seizure"). This court has taken a similar approach, considering the patrol car's positioning relative to the motorist's vehicle in evaluating whether the police seized the driver. *See People v. Cascio*, 932 P.2d 1381, 1386–87 (Colo. 1997) (observing that courts have deemed the position of a patrol car relative to a motorist's vehicle an important consideration in determining whether an interaction constituted an investigatory stop, and that where a patrol car blocks the defendant's ability to leave, the encounter is not consensual).

¶23 This court's holding in *Tate* suggests the same conclusion. There, a police officer observed the defendant's vehicle parked and running with its windows open at 4:35 a.m. *Tate*, ¶ 4, 290 P.3d at 1269. The officer "pulled up behind the vehicle, effectively blocking it in, and as he approached, saw the defendant sleeping in the driver's seat." *Id.* In determining whether the defendant had been seized, this court assumed that a "show of authority [had been] directed against [the defendant]" and that the defendant would have been "seized within the contemplation of the Fourth Amendment [when] he awoke." *Id.* at ¶ 11, 290 P.3d at 1270. However, we ultimately held that the officer's initial blocking-in of the car did not constitute a seizure because "[a] person who is unconscious clearly cannot perceive that there has been a show of authority directed against him." *Id.*

¶24 But this case is strikingly different than *Tate* in this regard. Brown was not unconscious and no evidence was admitted suggesting that Brown was otherwise

14

unaware of the officers' approach. Rather, the evidence reflected that when Officer Galvan pulled behind the Ford, the patrol car had its lights on. This evidence is important here because it is the prosecution that bears the burden of proving the constitutionality of the government's conduct. *See People v. Jorlantin*, 196 P.3d 258, 262 n.5 (Colo. 2008) ("In a warrantless arrest, if standing is not challenged, then the prosecution has the burden to prove the constitutional validity of the stop and subsequent search, seizure, or arrest."); *cf. People v. Allen*, 2019 CO 88, ¶ 15, 450 P.3d 724, 728–29 ("The prosecution bears the burden of establishing that a warrantless search falls within one of the exceptions to the warrant requirement."); *Hoffman v. People*, 780 P.2d 471, 474 (Colo. 1989) ("Warrantless searches and seizures are presumptively invalid under the fourth amendment to the United States Constitution and article II, section 7, of the Colorado Constitution . . . .").

¶25 Because there is nothing in the record before us to suggest that Brown was unconscious or otherwise unaware of the officers' presence, we conclude that Brown was seized from the moment the officers boxed in his vehicle. No reasonable person in Brown's position would have felt free to leave at that point. *See Cascio*, 932 P.2d at 1387. Indeed, even if Brown could have maneuvered his car out of the parking spot through the gap remaining between the cars, "no reasonable law-abiding person would take such evasive action in the presence of police officers." *Jones*, 678 F.3d at 301 n.4. Had Brown tried to leave after the

15

officers effectively blocked him in, such evasive action may itself have justified an investigatory stop. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *People v. Archuleta*, 980 P.2d 509, 515 (Colo. 1999) (noting that fleeing in "combin[ation] with other developments [can] form a sufficient basis for reasonable suspicion").

¶26    The question then becomes whether the officers had reasonable suspicion to justify this seizure. We agree with the People that the officers had reasonable suspicion of criminal activity once they smelled burnt marijuana, even though Officer Galvan stated that he was "not worried about the weed." *See Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) ("[S]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996))). However, the officers had already seized Brown for purposes of the Fourth Amendment *before* they noticed the smell of burnt marijuana. And it is undisputed that the officers did not have reasonable suspicion of criminal activity when they blocked in the Ford in order to approach its occupants. When the officers then exited the patrol car and approached Brown's vehicle from both sides, they still lacked reasonable suspicion that the occupants had committed, were committing, or were about to commit a crime. All the officers knew at that point in time was that the car was occupied and that some

16

type of smoke was coming out of the cracked windows. It was not until they contacted Brown that Officer Galvan smelled burnt marijuana and *then* had reasonable suspicion that the occupants were engaged in the open and public consumption of marijuana.

## D. The Issue Before the Court Is Not Limited to the Officers' Subjective Intent

¶27 Finally, we turn to the People's assertion during oral argument that the only issue the court may properly consider in connection with this C.A.R. 4.1 appeal is whether the trial court erred in considering the officers' subjective intent. We disagree.

¶28 To be sure, C.A.R. 4.1 limits the types of rulings from which interlocutory appeals can be taken. We have often stated that interlocutory appeals may not be employed to obtain pretrial review of issues not covered by C.A.R. 4.1. *See, e.g.*, *People v. Morgan*, 619 P.2d 64, 65 (Colo. 1980); *People v. Lott*, 589 P.2d 945, 947 (Colo. 1979); *People v. Morrison*, 583 P.2d 924, 927 (Colo. 1978).

¶29 But we have also recognized that some issues can be so intimately related to or interwoven with the challenged suppression ruling as to warrant this court's consideration as part of the C.A.R. 4.1 interlocutory appeal. *People v. Dailey*, 639 P.2d 1068, 1076 (Colo. 1982) (concluding that we may consider the ruling on disclosure of a confidential informant so intimately related to the suppression issue as to fall within the C.A.R. 4.1 interlocutory appeal authorization); *see*

17

*Morrison*, 583 P.2d at 927; *cf. Lott*, 589 P.2d at 946–47 (determining that validity of an arrest may be considered on interlocutory appeal when resolution of that question is necessary to determine a suppression motion). And, we have also affirmed trial court suppression rulings, albeit for different reasons, when the trial court reached the right conclusion, but for the wrong reasons. *See People v. May*, 859 P.2d 879, 884 (Colo. 1993) (concluding that the trial court applied the correct test and properly suppressed the evidence in question even though the language used in the ruling was incorrect).

¶30 Here, Brown's motion to suppress focused on whether the officers had reasonable, articulable suspicion for the stop in the first place. Recall defense counsel's argument at the suppression hearing: "[F]rom the very beginning of [the] encounter it was an investigatory stop based on the officers' actions, based on where they parked, [and] how they approached."

¶31 The fact that the trial court instead focused—erroneously—on the officers' subjective intent does not change that. Under these circumstances, we elect to consider the question of reasonable suspicion as it is, at the very least, interwoven with the ruling challenged. And, we conclude that the officers' seizure of Brown was unreasonable under the Fourth Amendment, and that while the trial court erroneously considered the officers' subjective intent, it nonetheless correctly

ordered the suppression of the evidence discovered as fruit of an unconstitutional seizure.

¶32    We break no new ground in our C.A.R. 4.1 jurisprudence in addressing this issue.  Under these particular circumstances, it makes no sense to ignore Brown's seizure and reverse a suppression ruling that ultimately reaches the correct conclusion.

### III.  Conclusion

¶33    We hold that the trial court correctly determined that the officers lacked reasonable suspicion for Brown's seizure.  Accordingly, we affirm the trial court's order suppressing Brown's statements, albeit on other grounds.