1
 2026 CO 49 The People of the State of Colorado, Petitioner v. Angel Adrian Castro-Velasquez. Respondent No. 24SC533Supreme Court of Colorado, En BancJune 23, 2026

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 22CA2184. Judgment Affirmed.

 Attorneys for Petitioner: Philip J. Weiser, Attorney General
Gabriel P. Olivares, Senior Assistant Attorney General
Caitlin E. Grant, Assistant Attorney General Denver, Colorado

 Attorneys for Respondent: Peak Legal Services, LLC Todd Narum
 Northglenn, Colorado

 JUSTICE HOOD delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL,
 JUSTICE SAMOUR, JUSTICE BERKENKOTTER, and JUSTICE BLANCO
 joined.

 OPINION

 HOOD,
 JUSTICE

 ¶1
Crim. P. 41.1 allows law enforcement to obtain a judicial
 order to collect certain kinds of nontestimonial
 identification evidence (like the DNA at issue here) without
 probable cause to believe that the suspect has committed a
 crime. During the execution of a Rule 41.1 order, officials
 may not interrogate the suspect. People v. Harris,
 762 P.2d 651, 658 (Colo. 1988). If they do, they violate not
 only the rule but also the Fourth Amendment strictures on
 which the rule is based.

 ¶2
 In this case, we examine how Colorado courts should determine
 when this concomitant prohibition on interrogation begins. In
 other words: When has a law enforcement official commenced
 execution of a Rule 41.1 order? Because the rule authorizes a
 narrow intrusion into a suspect's privacy to collect
 evidence based, in part, on reasonable suspicion to believe
 that the suspect has committed a crime- the same standard
 used for an investigatory stop-we hold that the execution of
 a Rule 41.1 order begins when a reasonable person in the
 suspect's position would not feel free to leave.

 ¶3
 On the facts presented here, we conclude that the detectives
 violated Angel Adrian Castro-Velasquez's rights under the
 Fourth Amendment, and a parallel provision in the Colorado
 Constitution, by interrogating him after they had seized him
 to execute a Rule 41.1 order.

 I.
Facts and Procedural History

 ¶4
 In 2020, an unknown individual broke into Z.H.'s home and
 assaulted her. The individual fled before the police could
 arrive. In her initial interviews with law enforcement, Z.H.
 said that although she didn't recognize the perpetrator
 during the assault, she thought it could be a classmate she
 had noticed on the public bus she took to and from school.
Z.H. eventually identified this classmate to the police as
 Castro-Velasquez.

 ¶5
 A detective filed an affidavit seeking a Rule 41.1 order to
 collect Castro-Velasquez's DNA via buccal swabs. After
 the court granted the order, the detective contacted
 Castro-Velasquez and told him that he had a judge's order
 to collect his DNA. The detective asked Castro-Velasquez to
 come to the station later that evening. But after they got
 off the phone, the detective realized that the terms of the
 Rule 41.1 order required that it be executed during the
 daytime. At some point after 5 p.m., the detective tried to
 reinitiate contact with Castro-Velasquez and sent a text
 asking him to find a time to come to the police station the
 next day. Castro-Velasquez didn't respond.

 ¶6
 The next morning, the detective and a colleague visited
 Castro-Velasquez's home. The detectives began
 audio-recording the interaction just before they knocked on
 his door. The recording captures the ensuing conversation
 between the detectives and Castro-Velasquez. After
 Castro-Velasquez invited them in, the

 detectives questioned him about the incident, eliciting a
 confession and details about the assault. After the
 questioning, the detectives reminded Castro-Velasquez that
 they had a court order to collect his DNA, placed him in
 handcuffs, and took him to the police station to execute the
 Rule 41.1 order.

 ¶7
The People charged Castro-Velasquez in a six-count criminal
 complaint related to Z.H.'s assault. Castro-Velasquez
 moved to suppress the statements he made to the detectives,
 arguing that the detectives had violated his rights under the
 Fourth Amendment, Crim. P. 41.1, and Harris in
 obtaining the statements. The trial court denied the motion
 in a written order. The case proceeded to trial, and a jury
 convicted Castro-Velasquez of various offenses related to the
 assault.

 ¶8
 Castro-Velasquez appealed, and a division of the court of
 appeals reversed his convictions and remanded the case for a
 new trial. People v. Castro-Velasquez, No. 22CA2184,
 ¶ 28 (June 20, 2024). It concluded that, at the time
 Castro-Velasquez made the inculpatory statements, the
 execution of the Rule 41.1 order had commenced because
 Castro-Velasquez had been seized within the meaning of the
 Fourth Amendment. Id. at ¶ 18. Therefore, the
 division determined that the trial court should have
 suppressed his statements. Id. at ¶ 26.

 ¶9
We granted the People's petition for certiorari
 review.[1]

 II.
Analysis

 ¶10
We begin by identifying the standard of review. Next, we
 review constitutional limitations governing certain
 police-citizen encounters; an exception that allows for the
 collection of nontestimonial identification evidence; and
 Crim. P. 41.1, which proceduralizes that exception. Then we
 apply those principles to the facts of this case.

 A.
Standard of Review

 ¶11
 Appellate review of a trial court's denial of a motion to
 suppress evidence presents a mixed question of fact and law.
People v. Gothard, 185 P.3d 180, 183 (Colo. 2008).
Under this standard, we typically defer to the trial
 court's findings of fact when they are supported by
 competent evidence in the record. People v. D.F.,
 933 P.2d 9, 14 (Colo. 1997). But "where the statements
 sought to be suppressed are audio- and video-recorded, and
 there are no disputed facts outside the recording controlling
 the issue of suppression, we are in a similar position as the
 trial court" to assess the facts related to suppression,
 so our review is de novo. People v. Madrid, 179 P.3d
 1010, 1014 (Colo. 2008). We also review de novo the

 attendant legal conclusions, such as whether a defendant was
 seized for Fourth Amendment purposes. People v.
 Ortega, 34 P.3d 986, 990 (Colo. 2001).

 B.
The Fourth Amendment

 ¶12
 The Fourth Amendment and its analogue in the Colorado
 Constitution protect individuals from unreasonable searches
 and seizures. U.S. Const. amend. IV; Colo. Const. art. II,
 § 7. Consistent with the text of these protections,
 individuals are entitled to be "secure in their
 persons" unless the police have "probable
 cause" for the search or seizure. U.S. Const. amend. IV;
Colo. Const. art. II, § 7; see also Safford Unified
Sch. Dist. No. 1. v. Redding, 557 U.S. 364, 371 (2009)
("[T]he required knowledge component of probable cause
 for a law enforcement officer's evidence search is that
 it raise a 'fair probability,' or a 'substantial
 chance,' of discovering evidence of criminal
 activity." (internal citations omitted) (quoting
Illinois v. Gates, 462 U.S. 238, 243 n.13 (1983))).

 ¶13
 These constitutional protections apply when a person has been
 seized. A person has been seized for constitutional purposes
 when, "in view of all of the circumstances surrounding
 the incident," a reasonable person wouldn't feel
 free to leave. People v. Brown, 2022 CO 11, ¶
 16, 504 P.3d 970, 975 (quoting Brendlin v.
 California, 551 U.S. 249, 255 (2007)). Despite societal
 pressure to cooperate with the police, not all police-citizen
 encounters amount to a seizure. People v. Johnson,
865 P.2d 836, 842 (Colo. 1994).

 ¶14
 Accordingly, Colorado law recognizes three categories of
 police-citizen encounters: (1) a consensual interview, (2) an
 investigatory stop, and (3) an arrest. Brown, ¶
 15, 504 P.3d at 975. A consensual interview involves a
 non-coercive request for cooperation. Id. No
 coercion means no seizure, and no seizure means that a
 consensual interview doesn't implicate the Fourth
 Amendment. Id. On the other end of the spectrum is a
 more formal and sustained seizure of a person in the form of
 an arrest, which, consistent with the Fourth Amendment
 baseline noted above, requires probable cause. People v.
 Castaneda, 249 P.3d 1119, 1122 (Colo. 2011). An officer
 has probable cause to arrest when all facts and circumstances
 known to the officer at the time of arrest justify the
 officer's belief that there is a fair probability that
 the person arrested has committed, or is committing, a crime.
Brown, ¶ 18, 504 P.3d at 975-76.

 ¶15
 This leaves the middle category: an investigatory stop, which
 requires reasonable suspicion. Terry v. Ohio, 392
 U.S. 1, 30 (1968). Officers possess reasonable suspicion when
 the "facts demonstrate that a prudent officer has an
 articulable basis for suspecting that a defendant is involved
 in criminal activity," a threshold lower than probable
 cause. People v. Brown, 217 P.3d 1252, 1256 (Colo.
2009).

 ¶16
 In exchange for a lower threshold justifying the seizure,
 investigatory stops must be "brief in duration, limited
 in scope, and narrow in purpose." People v.
 Pacheco, 182 P.3d 1180, 1183 (Colo. 2008) (quoting
People v. Garcia, 11 P.3d 449, 453 (Colo. 2000)). In
 judging whether an investigatory

 stop has been appropriately constrained, courts consider
 "the length of the detention, the extent of and reasons
 for any movement of the suspect from one location to another,
 the diligence exercised by the investigating officer in
 pursuing the investigative purpose that justified the
 detention, and the availability of less intrusive
 means." People v. Ball, 2017 CO 108, ¶ 9,
 407 P.3d 580, 584. And because the purpose of an
 investigatory stop is to confirm or dispel the officer's
 articulable suspicion, the stop "may be no more
 intrusive than required to diligently do so."
Id., 407 P.3d at 583. If the interaction provides
 the officer with probable cause, the Fourth Amendment permits
 the officer to elevate the seizure to a formal arrest.
Id. at ¶ 11, 407 P.3d at 584.

 ¶17
Crim. P. 41.1 seizures occupy a similar spot along this
 continuum of permissible governmental intrusion on individual
 liberty. We adopted the rule in response to the Supreme
 Court's opinion in Davis v. Mississippi, 394
 U.S. 721, 727 (1969). See People v. Madson, 638 P.2d
 18, 31 (Colo. 1981). In Davis, the Court built on
 Terry's foundation regarding investigatory stops
 to hold that, in limited circumstances, it is consistent with
 the Fourth Amendment for the police to collect nontestimonial
 identification evidence, like a suspect's fingerprints,
 without probable cause. Davis, 394 U.S. at 727-28.

 C.
Seizure for Nontestimonial Identification Evidence and Crim.
 P. 41.1

 ¶18
 Rule 41.1 authorizes a court to issue an order for the
 collection of nontestimonial identification evidence under
 certain circumstances. The order must be supported by (1)
"probable cause to believe that an offense has been
 committed," (2) "reasonable grounds . . . to
 suspect that the person named or described in the affidavit
 committed the offense," and (3) an affirmation that the
 collected evidence "will be of material aid in
 determining whether the person named in the affidavit
 committed the offense." Crim. P. 41.1(c).

 ¶19
 In Harris, we discussed the protections that must
 attend the execution of a Rule 41.1 order. There, an officer
 obtained a Rule 41.1 order and served it on Harris at his
 work site before immediately taking Harris into custody.
Harris, 762 P.2d at 652. On the way to the hospital
 to conduct the court-ordered procedures, the officer asked
 Harris questions, which the officer later testified were
 "part of the plan" to obtain incriminating
 information. Id. at 652-53. But Rule 41.1 allows
 officers lacking probable cause to seize a suspect only for a
 very limited purpose, which excludes interrogation.
Id. at 656. So, when the officer exceeded that
 limited purpose, he violated Harris's Fourth Amendment
 rights. Id. at 656-58. Because of the "special
 insult to human dignity" posed by the collection of
 nontestimonial evidence, People v. Williams, 557
 P.2d 399, 406 (Colo. 1976), a reviewing court's role is
 to ensure that officers only exercise this authority with the
 strict understanding

 that "Crim. P. 41.1 simply does not authorize a police
 officer to intentionally and purposefully elicit information
 from a criminal suspect . . . on less than probable
 cause," Harris, 762 P.2d at 658.

 ¶20
 In evaluating when the limitations of the rule apply,
 Harris was an easy case. When an officer arrives at
 a defendant's work site, serves a defendant with a Rule
 41.1 order, and immediately transports him to the hospital in
 the officer's vehicle for execution of the order,
 it's simple for the reviewing court to identify when
 execution of the order began and the point after which any
 inculpatory statements elicited by the officer went beyond
 the permitted duration, scope, and purpose of the authorized
 seizure. See Harris, 762 P.2d at 657.

 ¶21
 But under other circumstances, determining when an officer
 has begun to execute a Rule 41.1 order can be far less clear.
We have long interpreted Crim. P. 41.1 with reference to the
 limitations imposed by Davis and its progeny.
See, e.g., Harris, 762 P.2d at 654-55. Thus, we hold
 that the execution of a Rule 41.1 order begins when an
 officer exerts the level of control that would cause a
 consensual interview to become a seizure that is cognizable
 under the Fourth Amendment; that is, when a reasonable person
 wouldn't feel free to leave. See Brown, ¶
 16, 504 P.3d at 975.

 D.
Application

 ¶22
 The affidavit submitted in support of the Rule 41.1 order
 here shows that, when the detectives arrived at
 Castro-Velasquez's home, they possessed only reasonable
 suspicion, not probable cause, that Castro-Velasquez was the
 individual who had committed the alleged assault. Armed with
 that intermediate level of confidence, the scope of the
 permissible seizure was limited by the scope of the order and
 subject to the constitutional constraints on investigatory
 stops. See Harris, 762 P.3d at 656. Therefore,
 because "searches and seizures inside a home without a
 warrant are presumptively unreasonable," Groh v.
 Ramirez, 540 U.S. 551, 559 (2004), the Rule 41.1 order
 was the only valid authority for this seizure, and the
 execution of the Rule 41.1 order began when Castro-Velasquez
 reasonably no longer felt free to leave. This means that the
 detectives could seize Castro-Velasquez only for the purpose
 of collecting nontestimonial identification evidence and not
 for the purpose of conducting an interrogation. See
Crim. P. 41.1(h)(2); Harris, 762 P.2d at 658.

 1.
The Execution of the Crim. P. 41.1 Order Began Before
 Castro-Velasquez's Interrogation

 ¶23
 During the phone call and text message exchange with
 Castro-Velasquez the night before the interrogation, the
 detective told Castro-Velasquez that he needed to come to the
 police station so law enforcement could collect his DNA.

But the next morning, before Castro-Velasquez responded to
 the text message or appeared at the station, the detectives
 went to his home.

 ¶24
 The division below concluded, and we agree, that by the time
 Castro-Velasquez met the detectives at the door to his home,
 he reasonably believed that they were there to execute the
 order he had been informed of the night before. See
Castro-Velasquez, ¶ 18; see also People v.
 Melton, 910 P.2d 672, 677 (Colo. 1996) (indicating that
 an officer's subjective intent for initiating the
 interaction is relevant to the Fourth Amendment analysis when
 that intent is communicated to the suspect), superseded
 on other grounds by rule as stated in, People v.
 Zhuk, 239 P.3d 437, 439 (Colo. 2010). Therefore, the
 threshold between a consensual encounter and an investigatory
 stop had been crossed, and Castro-Velasquez had been seized
 for purposes of the Rule 41.1 order, as soon as the
 detectives knocked on his door. Harris, 762 P.2d at
 654.

 ¶25
 Simply put, if a suspect is informed by detectives of a
 judicial order authorizing the collection of his DNA to
 investigate a crime, and that defendant is faced with those
 detectives at his doorstep roughly sixteen hours later, a
 reasonable person in the suspect's position would harbor
 the objectively reasonable belief that the officers are there
 to execute the order and that he may not simply leave. At
 that point, the suspect is seized for Fourth Amendment
 purposes. Id. And unless the officers independently
 possess probable cause to

 believe the suspect committed the crime at issue, they are
 strictly prohibited from "intentionally and purposefully
 elicit[ing] information from" the suspect in a manner
 not authorized by the order. Id. at
 658.[2]

 ¶26
 The standard used to assess a seizure differs from the
 standard used to assess custodial interrogation under
 Miranda v. Arizona, 384 U.S. 436 (1966). See
People v. Matheny, 46 P.3d 453, 465-66 (Colo. 2002). A
 suspect gains the benefit of the protections provided under
 Harris before being subjected to
 Miranda-like custodial interrogation. This must be
 the case for two reasons: one formal and one functional.
First, in Harris, we never referenced
 Miranda custody as the controlling standard. And
 second, if such a rule were to be implemented, it would be
 far too easy for officers to circumvent Harris by
 disclosing the existence of a Rule 41.1 order to a defendant
 and then slow-rolling the imposition of Miranda-like
 custody.

 ¶27
 This rule operates in the same manner whether a suspect
 appears at the station or is met at his home. In the former
 circumstance, it may be easier to expeditiously begin the
 procedures approved in the Rule 41.1 order. But that

 doesn't mean that in the latter circumstance an officer
 may use the time during transit to interrogate the suspect.

 ¶28
The People emphasize that Castro-Velasquez invited the
 detectives inside. Even so, he only did so after the
 detectives told his family members, "[W]e need to talk
 to Angel." And once inside, the detectives continued to
 exert control over Castro-Velasquez, telling him at one point
 that they were "pushing [him]" to share more about
 what he might know about the crime. When Castro-Velasquez
 denied knowing anything about the alleged assault, the
 detectives responded, "[Y]ou do, Angel." To be
 clear, we don't include these details to suggest that the
 detectives coerced Castro-Velasquez into making the
 inculpatory statements he wishes to suppress, but only as
 further evidence that a reasonable person in
 Castro-Velasquez's position could infer from the tenor of
 the interaction that this wasn't a consensual interview;
 he wasn't free to terminate the conversation at will; and
 the execution of the Rule 41.1 order had begun.

 2.
Castro-Velasquez's Statements Must Be Suppressed

 ¶29
 From this conclusion, the division below applied
 Harris and determined that the appropriate remedy
 was suppression of the statements Castro-Valasquez made in
 response to the detectives' questioning.
Castro-Velasquez, ¶ 22; see Harris,
 762 P.2d at 657 ("Factors relevant to this determination
 include: the subjective intent of the police in executing the
 order; an objective assessment of the officer's

 actions in light of the facts and circumstances known to him;
 [and] the identity of the party who initiated the
 conversation ...."); see also People v. Diaz,
 53 P.3d 1171, 1177 (Colo. 2002) ("Suppression of the
 illegally obtained evidence was the . . . required remedy for
 the unconstitutional police search and seizure."). We
 agree.

 ¶30
 Two details in the record epitomize why Harris
 mandates suppression. First, at the motions hearing, the
 testifying detective admitted that the conversation was
 intended to "illicit responses about what
 [Castro-Velasquez] did the night of the crime." This is
 precisely the conduct Harris prohibits. 762 P.2d at
 657. Second, the circumstances of the conversation confirm
 that the detectives drove the questioning. At the hearing, a
 detective agreed that Castro-Velasquez "did not just
 blurt out the information" but that "[i]t was in
 response to questions." Again, this appears to be an
 exemplar of the conduct that Harris deemed improper.
Id. at 658.

 ¶31
 Lastly, like the division, we can't conclude beyond a
 reasonable doubt that Castro-Velasquez's inculpatory
 statements didn't contribute to his guilty verdicts; so,
 under constitutional harmless error review, reversal is
 appropriate. See Castro-Velasquez, ¶ 27;
see also Bernal v. People, 44 P.3d 184, 200 (Colo.
2002) ("To be classified as constitutional harmless
 error, a court must be confident beyond a reasonable doubt
 that the error did not contribute to the guilty
 verdict."). Considering the probative value of a
 defendant's confession, there is at least a

 reasonable doubt that the now-suppressed statements played a
 role in the jury's guilty verdict. See Hagos v.
 People, 2012 CO 63, ¶ 11, 288 P.3d 116, 119.

 III.
Conclusion

 ¶32
 The judgment of the court of appeals is affirmed.

---------

[1] We granted certiorari to review the
 following issue:

Whether the court of appeals erred in adopting a free
 to leave standard to determine Defendant was in custody
 pursuant to a Crim. P. 41.1 order.

[2] Of course, any voluntary statements a
 defendant makes during the execution of a Rule 41.1 order
 aren't the result of an interrogation and aren't
 entitled to suppression. Harris, 762 P.2d at 657.
But here, the audio-recording of the interview reflects that
 the detectives initiated the conversation and led
 Castro-Velasquez to the inculpatory statements.

---------